**Diana CRUZ, Individually and as Next Friend of Sergio CRUZ, Jr., a Minor, Appellant,**

v.

**PASO DEL NORTE HEALTH FOUNDATION f/k/a and d/b/a Providence Memorial Hospital, Appellee.**

No. 08–99–00002–CV.

Court of Appeals of Texas, El Paso.

March 29, 2001.

Rehearing Overruled May 16, 2001.

Mark R. Mueller, Kathleen P. Mccartan, Bonnie Bratton, Mueller Law Offices, Austin, Alice Oliver-Parrott, Burrow & Parrott, L.L.P., Houston, for Appellant.

Frank Feuille, IV, Scott, Hulse, Marshall, Feuille, Finger & Thurmond, El Paso, Kevin Dubose, Richard P. Hogan, Jr., Hogan Dubose & Townsend, L.L.P., Houston, for Appellee.

Before BARAJAS, C.J., LARSEN, and McCLURE, JJ.

### OPINION

McCLURE, Justice.

This is the tragic story surrounding the birth of Sergio Cruz, Jr. (Sergio). Diana Cruz, individually and as next friend (Cruz), filed a medical malpractice suit against Paso Del Norte Health Foundation f/k/a and d/b/a Providence Memorial Hospital (Providence) for injuries to her son allegedly sustained during labor. Following a lengthy trial, a jury found that the alleged negligence of two labor and delivery nurses was not a proximate cause of Sergio's severe brain injury and the trial court rendered a take-nothing judgment in favor of Providence. Cruz brings three

issues on appeal complaining that the jury's adverse findings are against the great weight and preponderance of the evidence. We affirm.

## FACTUAL SUMMARY

### Fetal Monitoring

Central to this appeal is the science of fetal monitoring. Readings from a fetal heart monitor can reveal, among other things, whether the baby is in danger due to oxygen deprivation, known as hypoxia. In such a case, the readings will show what are referred to as nonreassuring patterns that may reflect fetal response to hypoxia and the continuing depletion of oxygen reserves which could result in brain damage. A warning fetal heart rate pattern includes tachycardia while a nonreassuring pattern includes severe tachycardia. In a fetus, the normal heart rate is somewhere between 110 and 160 beats per minute, almost double the adult heart rate. A heart rate of more than 160 beats per minute is considered tachycardia, and more than 179 beats is considered severe tachycardia. Severe tachycardia reflects an hypoxic fetus who is decompensating. The decompensatory pattern refers to the point at which the baby no longer has placental reserves or the ability to cope with the normal stress of labor and demonstrates an inability to compensate for the stress. Tachycardia *per se* is not an indication of fetal distress without other nonreassuring signs.

The policies and protocols adopted by Providence characterize tachycardia as 160 beats per minute lasting ten minutes or more and severe tachycardia as 180 beats per minute lasting ten minutes or more. "Bradycardia" refers to a heart rate typically below 120 beats per minute. There are four main periodic changes in the fetal rate. One is described as reassuring, one as benign, and two as cause for concern.

Accelerations that are spontaneous due to fetal movement, when occurring in a normal fetus who is not experiencing a decreased oxygen level or asphyxia, will elevate its heart rate for fifteen beats above the baseline for at least fifteen seconds or longer. Other periodic changes in the fetal heart rate are called decelerations. The benign pattern, called an "early deceleration," is uniform and mirrors the uterine contraction. It typically occurs once labor has become established since it is caused by pressure to the head of the fetus. "Variable decelerations" occur during the contraction cycle and are variable in shape rather than uniform. The cause is generally umbilical cord compression resulting from the cord dropping down or wrapping around the neck. "Late decelerations" typically occur later in the contracting cycle. When the contraction begins, the heart rate decelerates and does not return to the baseline until after the contraction is completed. The cause of late decelerations is uteroplacental insufficiency. According to one expert, "this pattern is ominous and certainly not reassuring." There are also two types of variability in the fetal heart rate, which will become significant. As one witness explained it:

There is what is called short term variability, or short term changes, where from each heart beat you literally will see changes in—tiny changes. Each of us that are healthy has very small differences in time between each of our heart beats. We don't just beat like automaton. There is also an aspect of fetal heart rate called long term variability, which over a minute or two in time is reflected in the amplitude or how high and low the heart rate varies, anywhere from five to 15 beats per minute of variance in the heart rate.

Whenever a fetal monitor shows warning signs and nonreassuring patterns, Providence's protocol requires the repositioning of the patient, hydration, administration of oxygen at the rate of eight to ten liters per minute, vaginal examination, and placement of a scalp electrode if the membrane has been ruptured. These signs also require consultation with a physician.

### Presentment

#### 2:58 a.m.–3:55 a.m.

During the early morning hours of September 24, 1994, Cruz arrived at the Providence emergency room in labor. At 2:58 a.m., she was admitted to the hospital. Providence considered Cruz a "no-doctor patient" because she had received prenatal care at R.E. Thomason General Hospital and she came to Providence's emergency room without her medical records. Consequently, the Providence nurses and doctors were unfamiliar with her medical history, including information that she had complained of increased fetal activity on several occasions during the previous three weeks. Within two or three minutes of admission to the Labor and Delivery Department, Nurse Charlotte Graham attached an external fetal heart monitor and took Cruz's vital signs as well as a medical history. Graham also performed a vaginal exam and then, at 3:08 a.m., changed Cruz's position onto her left side so that the fetus would have better blood flow.

According to Graham, the fetal heart rate monitor should be run for fifteen to twenty minutes in order to establish the baseline. Initially, Sergio's fetal heart rate registered in the 140s and 150s and for about the next ten minutes settled into a baseline in the 150s and 160s. Sometime between 3:18 and 3:23 a.m., the baseline heart rate became tachycardic and then at 3:35 it began to rise above 160 to 170 beats per minute. Consequently, at 3:36 a.m., Graham again changed Cruz's position and administered oxygen. Rather than giving oxygen at the rate of eight to ten liters per minute as required by the protocol, Graham administered only four liters per minute due to her unfamiliarity with Cruz's cardiac and pulmonary history. Graham explained that if Cruz had cardiac or pulmonary difficulties, she could have experienced respiratory complications from the higher amount of oxygen, presenting a danger to both mother and baby. The fetal heart rate baseline then elevated to 180 beats per minute. At 3:47 a.m., Graham gave Cruz an intravenous (IV) bolus of lactated Ringers [1] pursuant to the protocol, and a few minutes later she again changed Cruz's position and administered additional oxygen. She performed another vaginal exam at 3:54 a.m. in order to determine whether any progress had been made, and then immediately called an obstetrician, Dr. Rodolfo Tomasino. Graham reported Cruz's status to Dr. Tomasino, including the baseline, tachycardia, variability, and decelerations recorded by the fetal heart monitor, and she told him of all the steps she had taken thus far. Dr. Tomasino approved Graham's actions up to that point, including the administration of oxygen at the lower level of four liters per minute and the IV fluids, and he told her to continue with the same procedures. Following this call, Graham administered another bolus of lactated Ringers.

### Between the First and Second Calls to Dr. Tomasino

#### 3:55 a.m.–4:55 a.m.

At 4:10 a.m., the fetal heart rate monitor strip showed what one expert witness

---

1. Lactated Ringer's is an isotonic solution that tends to stay in the vascular space and to increase maternal profusion and circulation which will hopefully begin the baby's profusion.

referred to as a subtle late deceleration followed by severe tachycardia of 190. Graham maintained that while she was concerned by the tachycardia, the fetal heart rate also had good variability. At 4:15 a.m., Graham asked her supervising charge nurse, Rosa Elva Avila, to read the fetal heart monitor strip. Avila did not express concern or alarm over the strip. Graham performed another vaginal exam at 4:40 a.m., and then at 4:45 a.m., called Dr. Tomasino again. She was unable to reach him because he had already left for the hospital.

### Events During Dr. Tomasino's Presence

#### 4:55 a.m.–6:22 a.m. (Birth)

Dr. Tomasino arrived at Providence at approximately 4:55 a.m., and read the fetal heart monitor strip at approximately 4:58 a.m. He gave no indication that he saw anything alarming on the strip. He did not order that Cruz's membrane be ruptured so that an internal fetal heart monitor could be attached, nor did he instruct the nurses to prepare for a cesarean section (C-section). Dr. Tomasino performed another delivery at 5:03 a.m. in an adjacent delivery room. At about 5:30, Dr. Tomasino returned to Cruz's room and a few minutes later, ruptured her membrane and placed a fetal scalp electrode on the baby. The amniotic fluid contained meconium, a bowel movement, which is typically passed by the fetus in response to stress. Fifteen minutes later, he ordered a C-section. He did not order an emergency C-section nor did he order it "stat."[2] He ran a fetal heart monitor strip in the delivery room from 6:06 to 6:12 a.m., and he performed

the procedure under spinal anesthetic, rather than the quicker general anesthesia customarily used for an emergency procedure. Graham reviewed the strip from the delivery room and considered it to be reassuring because "[t]he variability is there. You have decelerations. It looks good."[3] When Dr. Tomasino delivered Sergio at 6:22 a.m., the umbilical cord was indeed wrapped tightly around his neck and shoulders. At birth, Sergio was cyanotic, floppy, and severely depressed with no reflexes, poor color, and no respiratory effort.

### Post–Delivery

Within a few hours of his birth, Sergio suffered seizures which commonly occur within the first day after an hypoxic ischemic insult. Subsequent ultrasound, CT scan, and magnetic resonance imaging (MRI) exams performed within hours of birth and then in subsequent weeks and months revealed brain edema and then severe brain damage. Sergio also has cerebral palsy. He will never walk; he will never sit up unassisted; and he will never be able to feed himself or tell his mother that he loves her.

### The Allegations

Cruz originally sued Providence, Dr. Tomasino, and Nurse Graham. Graham was non-suited in her individual capacity some six months later. Dr. Tomasino was non-suited the day before trial began.[4] The remaining suit against Providence alleged that Graham and Avila were negligent in that:

---

**2.** Although the term "stat" was not defined by any of the medical professionals, their usage of the word analogized it to "urgent" or "immediate."

**3.** "Variable decelerations," as we have noted, are caused by umbilical cord compression

resulting from the cord dropping down or wrapping around the neck.

**4.** The record does not reveal the reason that Dr. Tomasino was non-suited, although seasoned litigators can hazard a guess.

• they failed to recognize a nonreassuring fetal heart pattern, and therefore, Dr. Tomasino was not notified in a timely manner that consultation was needed;

• they failed to engage in vigorous intrauterine assessment and treatment; and

• they failed to initiate the proper chain of command when Dr. Tomasino failed to order appropriate treatment, including an emergency C-section.

The hospital, in turn, was allegedly negligent in its training, supervision, or assignment of the nurses. Graham's personnel file revealed that one month prior to Sergio's birth, she "ha[d] problems interpreting fetal monitor strips." She was also written up for not taking constructive criticism well, for not attending workshops and seminars voluntarily, and for needing to improve when an emergency occurred because she lost control and appeared easily overwhelmed. Graham claimed not to know what was meant by these comments and she was not counseled about them. She had also complained that the nurses on the detail shift were sabotaging the nurses on the night shift and that there were problems with the unit as a whole.

### The Theories

Expert witnesses testifying at trial disagreed about the cause of Sergio's injuries and whether the injuries occurred before, during, or after labor and delivery. For the most part, Cruz's experts testified that Sergio's brain injuries were the result of hypoxic ischemic events occurring during labor. Providence's experts, on the other hand, offered alternative opinions about negligence and causation, including:

• an hypoxic event before arrival at the hospital;

• chronic hypoxia prior to labor;

• intrauterine growth retardation;

• seizures at eight to twelve hours of age;

• two massive cerebral strokes before labor and delivery resulting from emboli to the brain;

• sagittal sinus thrombosis; and

• infection (sepsis).

### The Verdict

The jury answered negatively to Question One: "Was the negligence, if any, of the EMPLOYEES ROSE AVILA R.N., AND/OR CHARLOTTE GRAHAM, R.N., a proximate cause of the injury in question?"[5] As a result, the jury did not reach Question Two: "Was the negligence, if any, of the HOSPITAL DIRECTLY a proximate cause of the injury in question?" The trial court rendered a take-nothing judgment in favor of Providence and later overruled Cruz's motion for new trial.

### The Issue on Appeal

By three issues presented for collective review, Cruz contends that the jury's adverse finding on the issue of negligence and causation is against the great weight and preponderance of the evidence.[6] She

5. The court's charge provided the jury with the following definition of "proximate cause":

> "*Proximate cause,*" when used with respect to the conduct of the EMPLOYEES ROSE AVILA, R.N. AND CHARLOTTE GRAHAM, R.N. means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of

must be such that a registered nurse (an R.N.) using ordinary care would have foreseen that the event or some similar event might reasonably result therefrom. There may be more than one proximate cause of an event.

6. The issues as stated in Appellant's brief are: (1) Was the jury misled into rendering a verdict in this case against the great weight and preponderance of the evidence? (2) Should

argues that Providence's experts misled the jury and offered incompetent and inconsistent theories about timing of the injury and causation which were predicated on assumed facts and which were contrary to actual facts proved. She calls the defensive alternative theories "internally inconsistent and outwardly contradictory." Providence maintains that Cruz's attack on defensive expert witnesses is factually inaccurate and legally impermissible. The litigants agree that in order for this Court to reverse the judgment, the jury's verdict on both negligence **and** causation must be so contrary to the great weight and preponderance of the evidence that it is manifestly unjust.

## STANDARD OF REVIEW

■ Where a party challenges the factual sufficiency of a failure to find on an issue upon which that party bore the burden of proof, the party must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983); *Gonzalez v. El Paso Hosp. Dist.,* 940 S.W.2d 793, 796 (Tex.App.—El Paso 1997, no pet.). A factual sufficiency point requires us to examine all of the evidence. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951); *Gonzalez,* 940 S.W.2d at 796. We may not pass upon the witnesses' credibility nor will we substitute our judgment for that of the jury, even if the evidence would clearly support a different result; rather, if competent evidence of probative force supports the challenged finding, we will sustain it. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998); *Gonzalez,* 940 S.W.2d at 796–97. In conducting our review, we are mindful that the jury was

not convinced by a preponderance of the evidence, and we may not reverse the judgment merely because we conclude the evidence *preponderates* toward an affirmative answer. *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646, 651 (Tex.1988); *McMillon v. Texas Dept. of Ins.,* 963 S.W.2d 935, 938–39 (Tex.App.—Austin 1998, no pet.). When a party complains of the jury's failure to find a fact, we may reverse only when the *great weight* of the evidence supports an affirmative answer. *Winkle v. Tullos,* 917 S.W.2d 304 (Tex. App.—Houston [14th Dist.] 1995, writ denied), *citing Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988) (holding that the court of appeals has authority to review jury's "failure to find" in same manner as it reviews jury findings).

## ELEMENTS OF MEDICAL MALPRACTICE

■ In a medical malpractice case, the plaintiff is required to show evidence of a reasonable medical probability that the injury was proximately caused by the negligence of the defendant. *Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex.1995); *Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex.1988). The Supreme Court has interpreted this requirement to mean that the ultimate standard of proof on the causation issue "is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Park Place Hosp.,* 909 S.W.2d at 511, *quoting Kramer v. Lewisville Memorial Hospital,* 858 S.W.2d 397, 400 (Tex. 1993). There are four elements to be proved: (1) a duty by the physi-

---

the trial court's take-nothing judgment in this case be reversed and should Appellant Diana Cruz's claims be remanded for new trial on the grounds that the verdict is against the

great preponderance of the evidence? (3) Did the trial court err and abuse its discretion in refusing to grant a new trial in this case?

cian/nurse/hospital to act according to applicable standards of care; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury.[7] *Denton Regional Medical Center v. La-Croix*, 947 S.W.2d 941, 950 (Tex.App.—Fort Worth 1997, writ denied). To establish proximate cause, a plaintiff must prove: (1) foreseeability, i.e., that the defendant should have anticipated the danger that resulted from her negligence; and (2) cause-in-fact, i.e., that the defendant's negligence was a substantial factor in bringing about the injury and without which no harm would have occurred. *Bradley v. Rogers*, 879 S.W.2d 947, 953 (Tex.App.—Houston [14th Dist.] 1994, writ denied); *Campos v. Ysleta General Hospital, Inc.*, 836 S.W.2d 791, 794 (Tex.App.—El Paso 1992, writ denied). With regard to cause-in-fact, the plaintiff must establish a causal connection based upon "reasonable medical probability," not mere conjecture, speculation, or possibility. *Bradley*, 879 S.W.2d at 953–54; *see Duff*, 751 S.W.2d at 176; *Lenger v. Physician's Gen. Hosp., Inc.*, 455 S.W.2d 703, 706 (Tex. 1970). However, a plaintiff need not establish causation in terms of medical certainty, nor is she required to exclude every other reasonable hypothesis; reasonable inferences may be drawn from the evidence. *Bradley*, 879 S.W.2d at 954. The plaintiff satisfies this causal link require-ment when she presents proof that establishes a direct causal connection between the damages awarded, the defendant's actions, and the injury suffered. *Texarkana Memorial Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 838 (Tex.1997). The trier of fact may decide the issue of proximate causation in medical malpractice cases when: (1) general experience and common sense will enable layman fairly to determine the causal relationship between the event and the condition; (2) scientific principles, usually proved by expert testimony, establish a traceable chain of causation from the condition back to the event; and (3) a probable causal relationship is shown by expert testimony. *Bradley*, 879 S.W.2d at 954, *citing Parker v. Employers Mut. Liab. Ins. Co. of Wis.*, 440 S.W.2d 43, 46 (Tex.1969).

## THE ROLE OF EXPERT TESTIMONY IN ESTABLISHING DEFENSIVE THEORIES

We must first address Providence's arguments that Cruz's attack on its expert testimony is legally impermissible. Citing *Burroughs Wellcome Company v. Crye*, 907 S.W.2d 497, 499 (Tex.1995),[8] Cruz contends that the opinions of several of Providence's experts constitute "no evidence" because they are premised on assumed facts and are factually unsupported. Cruz also argues, citing *Schaefer v. Texas Emp. Ins. Ass'n*, 612 S.W.2d 199, 205 (Tex.1980)

---

7. Only the second and fourth elements are contested in this appeal.

8. *Crye* involved a plaintiff's verdict which was ultimately reversed. The Court noted:

> When an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment.
>
> . . .
>
> However, to constitute evidence of causation, an expert opinion must rest in reasonable medical probability.... This rule applies whether the opinion is expressed in testimony or in a medical record, as the need to avoid opinions based on speculation and conjecture is identical in both situations.... Reasonable probability is determined by the substance and context of the opinion, and does not turn on semantics or on the use of a particular term or phrase.
>
> *Id.* at 499–500 (citations deleted).

and *Weiss v. Mechanical Associated Services, Inc.*, 989 S.W.2d 120, 126 (Tex. App.—San Antonio 1999, pet. denied), that certain expert opinions constitute "no evidence" because they were not based upon "reasonable medical probability." In other words, the crux of this appeal is whether competent evidence of probative force supports the jury's failure to find a breach of duty and a causal connection between the breach and the injury.

Providence first replies that in the wake of *Maritime Overseas Corp. v. Ellis*, Cruz is not permitted to challenge the reliability of expert testimony under the guise of a sufficiency argument because she did not raise these objections before trial nor when the evidence was offered. *Ellis* involved a plaintiff's verdict which was ultimately affirmed. Maritime did not contest the damages awarded for delayed and permanent neurotoxic damage on the ground that Ellis's expert testimony was speculative and not based on reasonable medical probability. *Ellis*, 971 S.W.2d at 408. It did not complain about the admission of any of the expert testimony. *Ellis*, 971 S.W.2d at 408. Instead, it contended that if the court of appeals had applied a proper scientific methodology to the expert testimony, the testimony would be legally insufficient as to causation. *Id.* "Thus, Maritme concludes, by way of its complaints about the court of appeals' factual sufficiency review, that there is *no evidence* of *some* of Ellis's actual damages." *Id.* Theourt disagreed:

> Simply put, Maritime did not make *any* objection to the reliability of Ellis's experts before trial or when Ellis offered the evidence. Maritime cannot complain for the first time after the verdict that the testimony from Ellis's five experts does not support the judgment.

*Id.* at 411.

Justice Hecht dissented, commenting that bare conclusions are incompetent and the fact that they are admitted without objection adds nothing to their probative force. *Id.* at 418 (Hecht, J., dissenting) *citing Casualty Underwriters v. Rhone*, 134 Tex. 50, 132 S.W.2d 97 (1939). Similarly, "[i]t is well settled that the naked and unsupported opinion or conclusion of a witness does not constitute evidence of probative force and will not support a jury finding even when admitted without objection." *Ellis*, 971 S.W.2d at 418 (Hecht, J., dissenting) *citing Dallas Railway & Terminal Company v. Gossett*, 156 Tex. 252, 294 S.W.2d 377 (1956). Further, Justice Hecht relied upon *Schaefer v. Texas Employers' Insurance Association*, 612 S.W.2d 199 (Tex.1980) in which the Court reviewed expert testimony concerning causation:

> We have reviewed the substance of Dr. Anderson's testimony in its entirety and we find that it does no more than suggest a possibility as to how or when Schaefer was exposed to or contracted the disease. We hold that his opinion is not based upon reasonable medical probability but relies on mere possibility, speculation, and surmise.

*Schaefer*, 612 S.W.2d at 204. Finally, he turned to *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706 (Tex.1997), in which the Court remarked that " 'an expert's bare opinion will not suffice' to provide evidence of causation of an injury; '[t]he substance of the testimony must be considered.' " 971 S.W.2d at 420.

> The testimony of an expert is generally *opinion* testimony. Whether it rises to the level of *evidence* is determined under our rules of evidence, including Rule 702, which requires courts to determine if the opinion testimony will assist the jury in deciding a fact issue.

*Id.* Many of Justice Hecht's comments form the predicate of Cruz's arguments here.

Secondarily, Providence argues that the cases cited by Cruz are distinguishable because all of them involved a challenge to allegedly deficient expert testimony tendered by the party who had the burden of proof at trial. Providence reasons that because a defendant does not have the burden to prove the absence of negligence or causation by a preponderance of the evidence, a plaintiff may not attack the reliability and competency of the defendant's expert testimony in the context of a factual sufficiency challenge.

■■■■ We readily agree that it is the burden of the plaintiff to establish the standard of care in a medical malpractice case. The failure of a defendant's expert to enunciate the standard of care does not require exclusion of the testimony. "Such a failure may ultimately go to the weight or value of the expert's testimony to the fact finder, but not to its admissibility, or to the qualifications of the witness to testify." *Warner v. Hurt*, 834 S.W.2d 404, 407 (Tex.App.—Houston [14th Dist.] 1992, no writ). As to causation, if there are other plausible causes of injury that could be negated, the plaintiff must offer evidence excluding those causes within reasonable certainty. *Weiss v. Mechanical Associated Services, Inc.*, 989 S.W.2d 120 (Tex. App.—San Antonio 1999, pet. denied), *citing Havner*, 953 S.W.2d at 730. Through her experts, Cruz attempted to negate each of the defensive theories of causation.[9] Must these defensive alternative theories be established within reasonable medical probability? The rule of "reasonable medical probability" relates to the

showing that must be made to support an ultimate finding of fact and not to the standard by which the medical expert must testify. *Id.; Blankenship v. Mirick*, 984 S.W.2d 771, 775 (Tex.App.—Waco 1999, pet. denied).

■■■ But the question is not yet fully resolved. We do not perceive Cruz to be challenging the *reliability* of the defensive expert testimony. Expert medical testimony concerning the possible causes of the condition in question, such as that offered by Providence, is admissible to assist the trier of fact in evaluating other evidence in the case. *Lenger*, 455 S.W.2d at 707. In *Harris v. Belue*, 974 S.W.2d 386 (Tex. App.—Tyler 1998, pet. denied), the Court addressed the defensive theory that there were other possible explanations of how an errant staple became attached to the plaintiff's bowel and that the plaintiff's expert's conclusion was only one of several equally probable explanations for the plaintiff's injury. The Court rejected that argument:

> However, there was no testimony supporting these alternate theories.... Without factual support in the record justifying the application of these theories, they rise to little more than conjecture and cannot be explanations which are equally probable in the face of the factual evidence supporting [the expert's] conclusions.

*Id.* at 394. While the issue before the Court in *Harris* was not one of factual sufficiency but legal sufficiency—whether an instructed verdict for the doctor was appropriate—we believe the concept is

9. The record reveals the following comment by Providence's trial counsel at the hearing on the motion for new trial: "From the direct comments of the six to eight jurors that we talked to after the case was over, it was clear that they thought the doctor, not the hospital, not the nurses, was responsible for this event, if blame was to be assessed, and they determined the case not on negligence: They determined the case based upon proximate cause.... Originally the hospital, the nurse and the doctor were all sued. Then the—Then the plaintiff dismissed the nurses and just before trial dismissed the doctor, during the trial, tried the nurses, not the hospital."

equally applicable here. We must review the record to determine whether the jury's failure to find was against the great weight and preponderance of the evidence. In so doing, we must determine whether there is factual support in the record justifying the application of the defensive theories. We turn now to a detailed review of the evidence as it pertains to breach and causation.

## THE EXPERT TESTIMONY AT TRIAL

### Plaintiff's Witnesses

#### Dr. Robin Britt

Dr. Britt is an associate professor at Texas Woman's University College of Nursing in Houston. She has a faculty appointment as an obstetrics-gynecology nurse practitioner and has a bachelor of science degree in nursing, a master's degree as a maternal-child clinical nurse specialist, and a doctorate in education, administration, and leadership. She explained fetal monitoring as a surveillance technique to determine whether a fetus responds well to the normal stress of labor. A fetus with an intact central nervous system and no underlying problems will respond well to the normal stress of regular uterine contractions. She then described the two types of fetal monitoring, internal and external, and characterized internal monitoring as more accurate.

Britt also described the chain of command as used in nursing. In situations where a nurse feels consultation is needed with a physician but one is not available, not offered, or not allowed, the nurse has the ability to initiate that chain of command. Britt characterized Providence's institutional policies as "excellent. They just weren't followed."

Q: Do you have an opinion here to a reasonable degree of nursing certainty as to when the nurse should have first informed the physician of what was happening here and what she should have told or should have done?

A: Around 20 minutes after the admission, 3:18 to 3:20, when you see the two serious decels, we had the tachycardia, and we had some ability to pick up the fetal heart rate well and I felt like when she made her initial report to the physician, which was done at, according to her, at 3:55—according to the chart at 4:00 a.m.—that it could have been at some point between 3:18 and 3:25. They did tell us that Dr. Tomasino was 10 to 15 minutes from the hospital and I feel like he could have arrived long before the first telephone call was made.

She also offered her opinion within a reasonable degree of nursing probability as to whether the standards of care for labor and delivery nurses and for hospital labor and delivery departments were met:

Essentially, I felt like the two nursing personnel involved failed to recognize a very nonreassuring fetal heart rate pattern and, therefore, the obstetrician was not notified in a timely manner and in an urgent manner that consultation was needed regarding this nonreassuring fetal heart rate pattern. And while some treatment was initiated, that vigorous intrauterine assessment and treatment was not. And ever further down the road, after evaluation of the patient at that brief moment by Dr. Tomasino—and no urgent treatment was ordered for this nonreassuring fetal heart rate pattern—Nurse Graham and other supervisory personnel failed to initiate that chain of command to advocate for that client.

A reasonably prudent nurse would have ensured that a C-section was performed by 4 a.m. If a doctor were to refuse to come in, "[y]ou go up the chain of command to your charge nurse."

I believe at 4:15 she did have Nurse Avila look at the strip, which no further—I mean, actually the chain of command was done. But you typically can go up to your house supervisor at that point who would probably find you a physician, either the chief of staff of the OB service or the chief of staff at the hospital to help you advocate for that client.

Britt then itemized the nursing missteps that violated the hospital's standard of care as stated in its policies and procedures:

- the decision to give oxygen at four liters;
- failure to initiate oxygen at the first severe prolonged deceleration, between 3:12 and 3:14 a.m.;
- failure to initiate additional positional changes;
- failure of the charge nurse to know that hypoxia causes tachycardia;
- failure of the charge nurse to know that uteroplacental insufficiencies cause late decelerations;
- failure to recognize nonreassuring fetal heart rate patterns.

### Dr. Donald J. Coney

Dr. Britt's concerns were echoed by Dr. Coney, who had read the depositions of Nurses Graham and Avila. Avila had been asked to draw an early deceleration and her drawing and definition were inaccurate. She did not know what caused late decelerations.[10] Nurse Graham incorrectly described the causes of variable decelerations and late decelerations both in her deposition and at trial, despite the fact that she had attended continuing education classes in the interim. Graham's explanation that she gave Cruz four liters of oxygen rather than eight to ten made no sense to Dr. Coney. He then identified the following nursing deficiencies as negligence:

- failure to respond to a nonreassuring fetal heart rate pattern;
- failure to inform Dr. Tomasino of the abnormal fetal heart rate pattern;
- failure to institute vigorous intrauterine resuscitative measures (larger boluses; rotate the mother side-to-side; higher concentrations of oxygen);
- failure to demand the physician's presence; and
- failure to anticipate that a C-section would be performed.

The hospital, in turn, was negligent in its training, supervision, or assignment of Avila and Graham. As to proximate cause, Dr. Coney testified:

My opinion is that those actions, not getting the doctor in to do a timely indicated cesarean section, allowed the progression of the hypoxia to Sergio's brain to the point that irreversible brain damage occurred, so it did cause what happened to Sergio.

The nurses should have made the call to the doctor between 3:18 and 3:23 a.m. Had the baby been delivered by 4:15 or 4:30 a.m., he would "have probably been okay."

In an effort to counter what has come to be known as the "empty chair defense," Dr. Coney diverted blame from Dr. Tomasino. He opined that Dr. Tomasino had not even looked at the fetal monitor strip

---

**10.** Nurse Marcia Kossman testified that Nurse Avila was knowledgeable in her interpretations of fetal tracings but that she had difficulty communicating due to a language barrier and her anxiety during her deposition.

when he arrived at the hospital. Instead, he was focused on the patient he was about to deliver:

> He's walking down the hallway thinking about a lady who's about to deliver a baby on the floor if he doesn't get there, and a nurse runs up and hands him this strip and says, " 'Dr. Tomasino, what do you think about it?' "

> I've been there. And your attitude is—and you might even say a few cuss words because your primary concern at that time is taking care of a fetus that's about to deliver on the floor. And you want to be there, and needless to say, the patient wants you to be there. The primary point that you're concentrating on is that patient about to have a baby. And so human nature being what it is, do I think that Dr. Tomasino accurately looked at this strip? And I don't even have to answer the question. I've been there for 30 years and I guarantee you, even in retrospect, thinking I never make a mistake, I realistically would not have accurately looked at this strip. And I think that's exactly what happened to Dr. Tomasino. He then delivered the other patient.

In other words, the breach in the standard of care was not Dr. Tomasino's failure to recognize a nonreassuring fetal heart pattern; the breach was in the nurses' failure to recognize the fetal distress and relay that critical information to Dr. Tomasino.

### Dr. John R. Seals

Dr. Seals is a pediatric neurologist. He defined cerebral palsy as a nonprogressive motor dysfunction of central nervous system origin. It excludes diseases of the spinal cord, diseases of the peripheral nerves or muscles, or muscular dystrophy and is generally confined to diseases and conditions which are nonprogressive, having to do with only the brain. He offered his opinion within reasonable medical probability as to the cause of Sergio's brain injury:

> The brain injury was the result of what we call a severe hypoxic-ischemic encephalopathy, in which—you know, in terms of it implying decreased oxygenation and decreased blood flow going to the brain.

As for the timing of the injury:

> The seizures, the EEG, the sequence of pattern that we see on the imaging studies and the appearance of the baby at the time of birth, all sort of tell you necessarily that this insult had to occur very shortly before the time of birth .... half hour to an hour, before birth.

On cross-examination, he clarified that the injury is a process, not an event:

> Q: A process starts somewhere, doesn't it?
>
> A: Yes.
>
> Q: Okay. Are you saying that the process started a half an hour to an hour before birth, or are you saying the process completed itself at that time?
>
> A: No, I think it was ongoing.
>
> Q: From when?
>
> A: It was ongoing at the time of birth, and if you stretch that time line back as to when there was irreversible damage, that's the time line that I would—I would submit as the most likely possibility would be, that the irreversible changes, although all sorts of physiology may be going on before that, the irreversible changes necessarily would have had to be, no longer than 30 minutes to an hour, maybe a little bit longer, plus or minus, and we're basing that on all this—the different type situations that we've—that we've been talking about earlier.

. . .

Q: What I'm trying to find out is, when did the process start?

A: I don't—I can't—the process that led up to the final—

Q: Yes.

A: —essentially, decompensation?

Q: Yes, sir.

A: I can't tell you.

Ultimately, Dr. Seals acknowledged that the process could have started twelve hours out and culminated a half hour to an hour prior to birth.

### Dr. Kenneth Swaiman

Dr. Swaiman, a pediatric neurologist, agreed with the diagnosis of hypoxic ischemic encephalopathy (HIE). He explained it as occurring when there is less than the normal expected oxygen concentration in the brain tissues. It causes energy metabolism in the brain to be deficient. He also discounted the various defensive theories. In his view, there was no evidence that Sergio had meningitis. Emboli did not fit the picture. The theory of a streptococcal infection was unreasonable. There was no sign of thrombosis. He disagreed with Dr. Harlass' opinion that the brain damage was related to the increased fetal activity noted by the mother in the weeks before delivery, and with Dr. Williams' opinion that there was severe stress as evidenced by the placenta in either the second or the early third trimester. He did not believe the neuroimaging studies were consistent with an injury that occurred within twenty-four to forty-eight hours before birth. In his experience, "babies who are born with this clinical picture and who have a base deficit and electrolytes of this type usually have had their major injury within one to one-and-a-half hours before they were born." Based on the time of birth at 6:22 a.m., Dr. Swaiman

in essence drew the window of injury between 4:52 and 6:22 a.m.

### Dr. Barry Pressman

Dr. Pressman specializes in diagnostic radiology with a subspecialty in neuroradiology. He offered his estimate as to the length of time between brain injury by hypoxic ischemia and the types of changes seen in Sergio's brain.

Well, the earliest I have ever seen it is about six hours in a very severely damaged brain; or even in severely damaged brains, you usually don't see it for like 12 hours and it may take as long as 24 hours. That would be unusual to take that long. So, 12 to 24 would be the range, but 24 would really be the outside range for how long it would take to see this.

Based upon the ultrasound taken eighteen hours after birth and the CT scan taken thirty-one hours after birth, the injury occurred between six hours before birth and six hours after birth. He summarized the twelve-hour window:

What I see is a series of images that show that the brain has suffered a significant injury of a hypoxic-ischemic type. I believe somewhere between six hours before birth and six hours after birth and it resulted in severe brain injury and destruction of brain tissue in the cerebrum, both sides, not quite symmetrically but quite severely.... This is a very severe brain injury and, therefore, I believe that the hypoxic-ischemic that caused it had to have been quite severe.

The brain damage was not consistent with meningitis, metabolic disorder, organic acidopathy, acidemia with acute compression, or sinus thrombosis.

*Dr. Enid Gilbert–Barness*

Dr. Gilbert–Barness specializes in pediatric pathology, which is the study of the nature and cause of disease in children. She served as director of pediatric pathology at the University of Wisconsin Medical School for twenty-three years, and at the time of trial was a professor at the University of South Florida at Tampa. She reviewed the placental slides [11] and explained the amnion and the chorion layers:

> [M]embranes are the sac in which the baby is floating in fluid and the fluid is called amniotic fluid. And the membranes are two layers, very thin layers, which are closely proximate and they are called the amnion and the chorion. The amnion is closest to the baby and the chorion is just immediately beneath it.

The decidua is another layer away from the amnion and chorion and forms the lining of the uterus.

Meconium is the material that is in the gastrointestinal tract or the bowel of a baby. If the baby exudes the meconium in the uterus, it will stain the amniotic fluid and it will be picked up by macrophages—scavenger cells in the blood that pick up foreign material. The macrophages then digest it and pick up the pigment from the meconium. There was no evidence of infection or inflammation in the membranes. When there is hypoxic stress to the baby, the chorionic villus, small capillary components of the placenta, responds by forming syncytial knots. If the baby were undergoing a lot of hypoxic stress over a long period of time, as in days or weeks, many syncytial knots should be visible. Sergio had none.

Dr. Gilbert–Barness found meconium in the amnion. Ordinarily, it takes about an hour for the meconium to be picked up by the macrophages. It takes longer for the meconium to be picked up in the chorion, from one to three hours. It takes four to six hours or longer for the meconium to reach the decidua. Her review of the slides indicated meconium in the amnion, a few cells in the chorion, but none in the decidua. She estimated the meconium was passed "between one and three hours, probably not much longer than three hours" before birth. Cruz was in labor at the hospital for less than three and a half hours, so accepting Dr. Gilbert–Barness's estimates, the meconium would have been passed within the first half hour of admission.

**Defense Witnesses**

*Dr. Andrew Wade Robertson*

Dr. Robertson is a maternal fetal medicine specialist. In his opinion, there was nothing on the fetal monitor strip between 2:58 a .m., when Cruz was admitted to the hospital, and 4:55 a.m., when Dr. Tomasino arrived at the hospital, which painted the picture of a patient who was in an emergent situation. Nor did the patient's chart indicate that by 5 a.m., a situation existed such that the chain of command should have been enacted. Based on reasonable medical probability, his opinion was that the nursing care was "appropriate, met the standard."

Dr. Robertson was thoroughly cross-examined concerning the theories of the other defensive experts. He had no opinion on whether a shower of emboli caused the brain damage. He believed that the seizures after birth were a *result* of the brain

---

11. A placental slide is a piece of tissue which is removed from the placenta, put into a paraffin block "just like candle grease" and so-lidified. Very thin sections are cut and reviewed under the microscope.

injury, not the *cause* of it. He was of the opinion that the cause was a pre-admission injury. This opinion was predicated on MRI findings taken at six days after birth which noted cerebral atrophy. He admitted on cross-examination that the MRI actually revealed cerebral edema, rather than cerebral atrophy.

Q: In fact, the opinions that you drew based on the imaging studies are wrong because your understanding of those imaging studies was wrong?

A: I don't believe that to be the case.

Q: You don't think you're wrong now? I'll give you a chance to be as clear as you can be on this one. Do you know whether or not there was atrophy on the MRI scan at six days of life that would indicate there was a preexisting injury that occurred prior to labor and delivery?

A: There was no atrophy on that particular MR scan, no.

Q: So where you said in your report that you based the timing on the cerebral atrophy on the MRI, that would be incorrect to do so because it's wrong. It's just plain wrong.

A: Well, it's my understanding there's presently atrophy. And we didn't get into specifically during my deposition, but my impression of the timing of the injury related to the use of ultrasound, CT scan, and MR scan. As you probably know, the MR scan, in the first three to six days of life is probably the most accurate way to predict long-term neurologic abnormalities related to the child. And if you take the ultrasound showing edema, the CAT scan showing edema, there's still edema on the MRI at six days, that would probably put the injury prior to her admission to the hospital.

Q: Now, Doctor, that is just absolute guesswork on your part, isn't it? Absolute total speculation, isn't it?

A: That is my opinion.

Q: And your opinion is total speculation, isn't it.

A: No more so than anybody else's.

### Dr. Frederick Harlass

Cruz is perhaps most critical of Dr. Harlass' testimony, which she characterizes as "Dr. Harlass' mystical 'wiggly' lines." [12] Dr. Harlass is the chairman of the department of obstetrics and gynecology at Texas Tech University. The "wiggly line" comments stem from his explanation of the fetal heart monitor tracings to the jury:

The key to looking at a fetal heart rate tracing when you have the tracing before you is, number one, how wiggly is that line? A wiggly line is a good line. A straight line, like the edge of this, is a bad line. Okay. So we have parameters. In other words, it says when it is normal and when it is not normal. Okay? So the basic fact is that the wigglier the line, the better the line. Okay?

. . .

I would not have been able to predict this outcome given that tracing, and that's what an obstetrician has to do. So therefore again here is what it looks like. This child—This is from that textbook sitting right over here. This is right out of there. This child has cerebral palsy. Look at the wiggliness. It starts out wiggly, wiggly, wiggly, wiggly. We've got these variables, but what does the wiggliness do now? What happens

12. Cruz's expert, Nurse Britt, referred to the variability indicators as "squiggles."

to that wiggliness? It's gone. It's gone. It's gone. It's all gone. Okay?

Now we're going to review this baby's tracings. Okay? Tachycardia, in other words, the heart is beating too fast, in other words, over 160 beats per minute, just by itself it's rarely associated with asphyxia. In other words, asphyxia is too much acid, not enough oxygen. As long as it's got normal variability, wiggliness of the line and it doesn't have periodic changes, in other words, it's just by itself, the key feature is wiggliness.

. . .

This is the message: " 'In the presence of a normal fetal heart rate variability, the wiggliness of the line, no matter what other patterns may be present, the fetus is not suffering from cerebral tissue asphyxia,' " that is, too much acid, too low oxygen.

Harlass then gave his opinion, expressed in terms of reasonable medical probability, as to specific acts which Cruz had alleged to be negligent. He thought Nurse Graham's statements to Dr. Tomasino at 3:55 a.m. that the fetal heart tracings showed tachycardia and some variable decelerations were accurate. He personally knew Nurse Graham and considered her to be a competent nurse. There was no necessity at that point for Dr. Tomasino to come in, rupture the membranes, put in an internal lead, and order a C-section.

Dr. Harlass noted that using four liters of oxygen rather than eight to ten liters was not the proximate cause of the injury. Failure to telephone the doctor was not the proximate cause. Failure to enact the chain of command to obtain an early C-section was not the proximate cause. He was not saying an infection caused the brain damage, nor that the baby had a congenital malformation. He had not heard of deep strep bacteria causing HIE,

and Sergio did not have sepsis. He did not believe that there were maternal complications that injured the child, although he opined that the jittery movements Cruz had reported in recent weeks were in-utero seizures. On cross-examination, Dr. Harlass said he believed that "[b]ased on that fetal heart rate tracing, particularly the initial portions of it, I feel that this baby received an insult prior to admission to Dr. Tomasino's service at Providence."

### Dr. Rodolfo Tomasino

Dr. Tomasino is an obstetrician/gynecologist who has delivered more than 10,000 babies. At least once a year, he attends a seminar on fetal heart monitoring.

Q: What did you do with respect to Sergio Cruz, his case, when you got to the hospital?

A: Well, what I did was call the nurse to show me the fetal monitor strip. I didn't go straight to the patient. And they were calling me for the other patient that was just about ready. I checked on the fetal monitor and I told her that as soon as I delivered this patient that I would go and see the mother of this baby. And that's what I did.

The fetal strip was not reassuring, but did not indicate that the baby was in distress. When he ruptured the membranes, he noticed the presence of meconium and that the head of the baby was still a little high. He thought the best thing to do was to deliver by cesarean section, but he did not order the C-section "stat." The decision as to the type of anesthesia to be utilized was left to the anesthetist and here, the anesthesiologist performed a spinal. With a "stat" C-section he would use general anesthesia.

Q: Based upon your review of the records and your knowledge of the

case and based upon your experience as a practicing OB/GYN, do you have an opinion as to whether or not the nurses in this case did what they should have done and did so appropriately with the care—with respect to the care of the mother and the baby in this case?

A: Yes, I do.

Q: What is your opinion?

A: I think that they did the right thing.

Q: All right. If the facts of this case or the facts of any case would require you to testify against Providence Hospital, would you do it if it was truthful?

A: Could you repeat that question, please.

Q: Yes. If the facts of this case or the facts of any case would require you to testify against Providence Hospital, would you do it if it was the truth?

A: Well, if it is the truth, I have to tell the truth.

. . .

Q: Do you believe based upon reasonable medical probability that Providence Hospital, its nurses, its technicians, its medical staff or any employees should be blamed for what happened in this case?

A: I don't think so.

Q: Doctor, are you an employee of Providence Hospital?

A: No, sir.

### Dr. Anthony Lucci

Dr. Lucci, a specialist in obstetrics and gynecology, testified in support of the chronic hypoxia causation theory. He explained to the jury why labor is stressful. Every time the mother has a contraction, if it lasts for sixty seconds, there is a disruption of blood flow to the baby for that sixty-second period of time, because when the uterus contracts, the blood vessels that go through the uterus to the placenta "get shut off." The normal healthy baby can handle the contractions because after each contraction there is a two-minute interval when the uterus relaxes "and like a tide, the blood flows back into the placenta, restores the oxygen level to the baby, the baby is doing fine."

In his written report, Dr. Lucci wrote that "[t]he cord arterial pH was 7.22, PCO2 was 25, PO2 was 197, and the base excess was minus 15." In his conclusions, he relied on that pH. As he acknowledged at trial, it was not cord pH because no cord pH was ever taken.[13] The base deficit of minus 15 meant that the baby was acidotic and the acids were a result of hypoxia. However, the deficit did not indicate when the acidosis occurred. It could have occurred several hours, or even days, prior to admission. In short, Dr. Lucci believed there was no evidence that severe hypoxic injury occurred during the three-hour labor and the MRI findings were not consistent with injuries that occurred dur-

---

13. Cord gas samples are taken from the umbilical cord to obtain values for venous cord gas and arterial cord gas. The pH factor relates to the level of acid. "[T]he higher the number, less acid; lower the number, more acid." Although cord pH was never taken, the right radial artery showed a pH of 7.22 at twenty-thee minutes after birth. Dr. Coney testified that the Myers baboon studies suggested the possibility of extrapolating backwards to ascertain the pH value at birth. Although he was not certain whether the studies would be appropriate in evaluating Sergio, an application of the theory would have indicated a pH of 6.99 at birth. Dr. Harlass pegged it at 7.0 or 7.1. Neither Dr. Robertson nor Dr. Wilson believed it was possible to calculate pH at birth from data obtained twenty-three minutes after birth.

ing labor and delivery. The likelihood was that Sergio had sustained this devastating neurologic injury prior to the time Cruz presented at the hospital.

### Dr. Harry Lee Wilson

Dr. Wilson is a pediatric pathologist employed at Providence. His examination of the placental slides found a number of unusual things. The vein had some inflammation. There were meconium-laden macrophages and the chorionic villi of the placenta showed swelling or edema. For the macrophages to be stained deeper in the chorion generally takes about three hours. One also looks for reactivity of the surface amnion itself and in this placenta, the lining cells were not reactive. As to how long the meconium had been there, he estimated "probably more than three hours, probably less than 12 hours...."

In his opinion, Sergio suffered severe insult around the time of the seizures, after birth. He probably had suffered intrauterine growth retardation [14] and either some metabolic or intrinsic structural problem in brain development. The problems at birth were not a reflection of difficulties from the birthing process. "So I think it's a combination of a preexisting brain problem—and I'm not sure what the problem is because I'm not sure what all the testing has been done and could be done to work out what that problem is—with some seizure event that is both a reflection of the problem but also compounds the problem when that event occurs."

On cross-examination, he acknowledged the following excerpt from a well-recognized medical textbook:

" 'Hypoxic ischemic encephalopathy, usually secondary to perinatal asphyxia is the single most common cause in neonatal seizures in both full-term and premature infants. In our experience, approximately 60 to 65 percent of patients have this encephalopathy as the primary cause. Seizures occur in the majority of patients with significant hypoxic ischemic encephalopathy, and characteristically, the spells occur in the first 24 hours.' ... 'In fact, 60 percent of our events with seizures secondary to this type of encephalopathy experience the onset of spells within the first 12 hours of birth.' "

On redirect, he explained:

Q: You were asked a question by Mr. Mueller about what is the most common cause of seizures within the first 24 hours of life. I'd like to ask, Doctor, what is the most common cause of seizures in a baby who is not globally damaged by hypoxic ischemic encephalopathy?

A: I'm glad you asked. That's a question—that actually is the reason I have trouble answering the question as to the most common source of seizures. Because when you have a baby that doesn't express evidence of significant injury, then the most common cause of seizures is some preexisting structural or metabolic problem. That's in distinction to a baby who is born with clinical evidence of hypoxic ischemic encephalopathy, in other words, severely depressed, and then the seizures.

So the distinction I'm making is if a baby is fairly normal and shows seizures, it's not hypoxic ischemic ence-

14. There was repeated reference at trial to the proportional relationship between Sergio's birth weight and the size of the placenta. Generally speaking, the placenta represents ⅐ of the birth weight. Sergio weighed 2,800 grams at birth while the placenta weighed 650 grams, or roughly 23 percent of the birth weight.

phalopathy that's going to be the cause of those seizures. It's going to be some preexisting problem with the brain or the brain metabolism. Whereas if the baby is globally damaged, hypoxic ischemic encephalopathy is the most common cause of the global damage, and also the most common cause of seizures that would be associated with that global damage. So that's a distinction that I think is important to view in this case.

### Dr. Leo J. Williams

Dr. Williams is a pathologist who offered what has been characterized in the record as the "shower of emboli" theory.

Q: Doctor, you were retained in this particular case by me to address whether the brain damage occurred around the time of labor and delivery, or did it occur at some point in time during intrauterine development prior to the September [sic] of labor and delivery. Is that right?

A: Correct.

Q: And do you have an opinion on that particular subject?

A: Yes, I do.

Q: And is that opinion based upon reasonable medical probability?

A: Yes, it is.

Q: And what is that opinion?

A: My opinion is that this baby suffered two massive cerebral infarcts; in other words, had two massive strokes to the brain shortly prior to the time of labor and delivery, and one of those conditions that could not be predicted or prevented, and with a high degree of probability, almost absolute certainty, this is a result of embolization of emboli to the brain. The main thing is this baby does not have diffused global brain damage. It has focal infarction.

He also testified concerning the likelihood of birth asphyxia. The American College of Obstetrics and Gynecology have established criteria for determining whether a baby had birth asphyxia. First, umbilical cord arterial pH should be less than 7.0.[15] Second, the infant should have an Apgar score of zero to three for longer than five minutes.[16] That did not happen here. Third, there should be an immediate neonatal course which could be characterized by severe acute brain damage, including coma or deep stupor for a prolonged period of time, marked hypotonia and often associated with seizures. Fourth, one would expect to see multisystem organ damage, particularly evidence of renal damage, usually characterized by a lot of blood in the urine and a prolonged period of low urine output. There was no evidence of any organ damage that he could attribute to severe birth asphyxia.

As a pathologist, Dr. Williams was interested in patterns of damage. From the

---

15. We reiterate here that no cord pH was ever taken, but the two experts who applied reverse extrapolation calculated the cord pH at birth within a range of 6.99 to 7.1.

16. Apgar scores are a method of assessing five different components of a functioning baby: respiratory effort, heart rate, reflex activity, color, and muscle tone. Each of the elements gets a score of zero, one or two; a score of two represents the best condition and zero essentially denotes the absence of function. Typically, Apgar scores are measured at one and five minutes after birth. There was considerable dispute at trial as to whether the scores which were recorded in Sergio's medical charts were accurate. At one minute after Sergio's birth, the records of the attending pediatrician reflect an Apgar score of six; at five minutes, the score was eight. Elsewhere in the records, the Apgar scores are recorded as seven and eight.

pattern of damage, he can pinpoint the cause:

Those areas of the brain which have a very rapid development, high metabolic rate, high oxygen utilization, these are the ones that will be damaged first, and sometimes only those areas of damage. If the damage is more extensive, then you also get other areas of damage. So with severe birth asphyxia in a term infant, the major damage is going to be in the gray matter and in the cerebral cortex and the basal ganglia.

Q: In this particular case was there damage to the basal ganglia?

A: There was. We'll go into that, but apparently the basal ganglia was— at least part of it was perfectly normal. So what you have, you will never get this massive cystic encephalomalacia. In other words, where you have an infarct where you kind of liquefy, [sic] and end up with a big cystic cavity filled with fluid, because if that was to happen, remember, the neurons are the most severely damaged. Every neuron in your head would be dead and you just can't survive. So you don't get massive areas of cystic encephalomalacia with birth asphyxia. If they survive, what they will end up with is an atrophic brain, in other words, a shrunken brain from the diffuse damage. So this is what we call global injury to the brain.

. . .

Q: What is cystic encephalomalacia?

A: Cystic encephalomalacia is a total destruction of brain tissue. And that area will become liquefied [sic]. So what you end up is with a fluid-filled cyst. So they found a large area of cystic encephalomalacia on both sides. However, they report there was no damage to the brain stem, no damage to the cerebellum, and they also say at least a portion of the basal ganglia were not affected.

Well, that is not the pattern. You never see that pattern with birth asphyxia. What this is is a large stroke. If you have a stroke—And what is a stroke? Or a brain infarction? It's not different, basically, than a myocard infarction. A myocard infarction is a heart attack. Now, a heart attack is due to obstruction of a blood vessel causing destruction of the heart. So that's a heart attack, or myocard infarction.

The same thing is true in the brain. Cerebral infarction is a stroke. It's due to some type of obstruction of a blood vessel. Now, most cases it's obstruction of an artery. And in this particular setting, it's not common, but it's not all that uncommon, sometimes they will throw around the time of labor and delivery or late pregnancy, they will throw, actually, emboli to the brain. So we think these emboli come from little blood clots in the placenta. And you will end up—the blood clot will break up, and you may get one infarct or if the blood clot breaks up, it may get more than one infarct. Here we had two.

Q: Let me have you back up just a second. What is an emboli, or what is an embolus?

A: An embolus is a little blood clot. We see these usually right around the time of labor and delivery, or very late in pregnancy. And they can come from anywhere in the fetal venous circulation, but we think most of them come from the placenta. And while we think it happens in most of these cases, there are

large veins that course over the surface of the placenta, and when these babies get close to time of labor and delivery, they can give that placenta a good swift kick. And we think what happens in some of these cases, that the fetus near term, big and strong, can kick these veins, cause a thrombosis. And sometimes we find these thrombi on the surface of the placenta.

Now, if you have one of those thrombi and it breaks up, it will produce a shower of emboli and much—about, oh—a large portion of the circulation will go to the brain because they're undergoing rapid development, and you will end up with areas of cerebral infarction.

There was no question in his mind that this was what happened to Sergio.

He was cross-examined concerning his view of the other defensive theories in the case. He put Dr. Wilson's theory that the injury was due to seizures out "in left field." He called Dr. Lucci's opinion of chronic hypoxia "silly." Nor did he believe there was any evidence of an infectious process.

### Dr. Robert Woody

Dr. Woody is a pediatric neurologist and Sergio's treating physician. He had a broad time frame as to when Sergio probably suffered an hypoxic ischemic insult. Within reasonable medical probability, the injury occurred anywhere in the first twenty-four to forty-eight hours before birth. The pattern of injury to the brain as it evolved clearly indicated that he acquired an injury very late in pregnancy. He did not believe that anyone could say within a degree of reasonable medical certainty that the hypoxic event occurred between 2:00 and 6:22 a.m. However, he wrote in a report to the attending pediatrician at Sergio's birth that "[i]t is not clear what happened, but something happened very late in the perinatal period at the time or right before delivery. Whether this was a cord accident or some other obstetrical event, I'm unable to say."

Dr. Woody also took issue with the other expert witnesses, both plaintiff and defense. When told that Dr. Pressman testified that the MRIs did not show a sagittal sinus thrombosis, Dr. Woody was adamant that a sinus thrombosis existed on the right lateral side. He also disagreed with Dr. Williams' testimony that cystic encephalorrhagia cannot result from an hypoxic ischemic insult. He had no evidence that Dr. Williams' shower of emboli caused the brain damage five days before birth.

### Dr. Elias Chalhub

Dr. Chalhub reviewed the MRIs and CT scans. In his view, Sergio "suffered from ravages of an intrauterine infection," most likely a bacterial infection, since there was bacteria in the gastric aspirate which caused lack of oxygen and blood flow which caused an hypoxic ischemic encephalopathy and resulted in brain damage. Additionally, there was a gamma hemolytic streptococcus [17] recovered. As to timing, he believed the injury occurred twelve to twenty-four hours prior to delivery. He agreed that there was a sinus thrombosis. He did not believe the shower of emboli theory, but would not go so far as to call it silly.

## WAS THE JURY'S FAILURE TO FIND AGAINST THE GREAT WEIGHT AND PREPONDERANCE OF THE EVIDENCE?

 Cruz's arguments focus on the language in *Maritime Overseas Corporation v. Ellis* that:

17. A gamma D strep is capable of causing sepsis and meningitis.

[B]are conclusions and assertions unsupported by facts of record, expert opinions based on facts merely assumed and not proved, or facts different from those proved, and scientific testimony without any reliable basis, even if admitted without objection, are no evidence to support a finding of fact.

971 S.W.2d at 421. In this instance, she applies the holding to a failure to find. As to negligence, she contends that Dr. Harlass' testimony that the fetal monitoring strip was reassuring was based on his opinion that the strip showed short-term variability throughout. This conclusion was predicated upon the ability of an external fetal monitor to read short-term variability whereas other experts, including Dr. Robertson, opined that an external monitor is incapable of reading short-term variability. Yet Dr. Robertson also testified that nothing on the fetal monitor strip between the time of admission at 2:58 a.m. and the time that Dr. Tomasino arrived at the hospital at 4:55 a.m. presented a picture of a patient who was in an emergent situation. In his view, based upon reasonable medical probability, the nurses' conduct had not breached the standard of care. Cruz complains that Dr. Robertson admitted he had not read the hospital protocol and that as a result, he could not testify concerning the applicable standard of care. Because Cruz lodged no such objection at trial, the credibility of his testimony during rigorous direct and cross-examination was for the jury to determine. Accordingly, we must incorporate his testimony into our sufficiency analysis.

We also acknowledge that there was abundant conflicting causation evidence. Even disregarding the seemingly more extreme defensive theories of infection, intrauterine growth retardation, post-birth seizures, emboli, and chronic hypoxia, we are left with a recurrent theme of HIE. The critical inquiry is when did the injury occur? Cruz emphasizes the testimony demonstrating that the injury occurred while Cruz was in labor at the hospital and under the care of Nurses Graham and Avila. Yet Cruz's own experts had varying opinions on the timing:

- between half an hour and an hour before birth (Dr. John R. Seals, pediatric neurologist);

- forty-seven minutes before birth (Dr. Donald J. Coney, obstetrician-gynecologist);

- between one hour and an hour and a half before birth (Dr. Kenneth F. Swaiman, pediatric neurologist);

- between one and three hours before birth (Dr. Enid Gilbert–Barness, pediatric pathologist); or

- between six hours before birth and six hours after birth (Dr. Barry Pressman, diagnostic radiologist).

Dr. Pressman's twelve-hour window of injury is the broadest estimate by Cruz's experts.

Likewise, Providence's experts also differed in their opinions of when the injury might have occurred, ranging between three hours and several days before birth to twelve hours after birth. Providence argues that if the jury chose to believe those experts who stated that the injury preceded Cruz's arrival at Providence or those experts who held the opinion that the injury occurred after Sergio's birth, then the jury's failure to find on the issue of causation would not be against the great weight and preponderance of the evidence. Providence attempts to pinpoint the exact time when the injury occurred, and then argue that if the jury believed it happened outside the window when the two nurses were responsible for Cruz's care, then the evidence is factually sufficient on the issue of proximate cause. This analysis ignores

the fact that many experts testified about the *process* involved and then tried to pinpoint when the injury became irreversible. The process may have been ongoing during labor and became irreversible later at a time when the doctor had primary care of Cruz.

Providence also suggests that even assuming for the sake of argument that Cruz's experts were correct in their criticisms of Graham and Avila and in their opinions about the timing of Sergio's injuries, Cruz's argument on appeal must still fail because she failed to establish a causal connection between the conduct of the nurses and the injuries to Sergio. Cruz counters that Dr. Coney testified that the nurses' failure to get Dr. Tomasino into the hospital to perform "a timely indicated cesarean section, allowed the progression of the hypoxia to Sergio's brain to the point that irreversible brain damage occurred, so it did cause what happened to Sergio." Providence further posits that the jury could have disbelieved Dr. Coney because he based his opinion on, assumed facts that proved to be inaccurate, namely, that Dr. Tomasino did not examine the fetal monitoring strip when he arrived at the hospital. Additionally, Dr. Harlass and Dr. Tomasino both contradicted Dr. Coney's opinion on causation.

Medical malpractice cases often present "a battle of the experts ." In *Magee v. Ulery,* 993 S.W.2d 332 (Tex.App.—Houston [14th Dist.] 1999, no pet.), the Court affirmed the jury's failure to find negligence. The plaintiff's expert claimed the defendant was negligent; the defense expert said he was not. "Dr. Lambert testified that the diagnosis was 'erroneous' but he also testified that Dr. Goldberg was not negligent. The jury could have believed Dr. Lambert instead of Dr. George." *Id.* at 336.

Because the jury is the sole judge of the credibility of the witnesses and the weight to be given their· testimony, we may not substitute our judgment for that of the jury's simply because we 'may disagree with the jury's findings.

*Id.* Justice Wittig in his concurring opinion noted the defensive strategy: "Clearly the defense of this malpractice case involved the time worn strategy of pointing the finger away from the named defendant toward a non-party, here Dr. Conte (aka the empty chair defense)." *Id.* at 339. Dueling experts were also at the center of *Warner v. Hurt,* 834 S.W.2d 404 (Tex. App.—Houston [14th Dist.] 1992, no writ).

Even if we as a reviewing court might view the circumstances of this tragic case contrary to the way the jury did, we cannot become a thirteenth juror and substitute our judgment for theirs. In a battle of competing evidence, it is the sole obligation of the jury to determine the credibility of the witnesses and to weigh their testimony. It is the obligation of the respective advocates to persuade them in their decision. And it is our obligation to see that the process was fair and carried out according to the rules. We cannot under any circumstances re-try the case.

*Id.* at 409.

More factually analogous is *Kirkpatrick v. Memorial Hosp. of Garland,* 862 S.W.2d 762 (Tex.App.—Dallas 1993, writ denied). There, the plaintiffs' son, born at the defendant hospital, was afflicted with cerebral palsy. They contended that an hypoxic ischemic insult to the brain occurred during the active labor or delivery as a result of negligently rendered medical services. The hospital's theory was that the child's cerebral palsy did not result from any negligent acts of the hospital during delivery but existed long before Mrs. Kirkpatrick went into active labor. In other

words, the hospital contended that the child's neurological deficits resulted from a congenital brain malformation unrelated to the medical services provided. The plaintiffs settled their claim against the obstetrician and dismissed their claims against the other physician and the nurse. The hospital was the sole remaining defendant. During trial, the plaintiffs learned that the hospital had failed to disclose the name of a respiratory therapist who was in the delivery room at the time of the child's birth. As a result, the trial court struck the hospital's pleadings and entered a default judgment against the hospital on the liability issue. The jury then answered "none" to the damage questions. The hospital's position was that the jury's negative answer to the damage questions meant that the Kirkpatricks did not convince the jury that the hospital's negligent medical services during labor and delivery caused the child's cerebral palsy. The appellate court affirmed.

> It is particularly within the jury's province to weigh opinion evidence and the judgment of experts. *Pilkington v. Kornell*, 822 S.W.2d 223, 230 (Tex. App.—Dallas 1991, writ denied). The jury decides which expert witness to credit. *Pilkington*, 822 S.W.2d at 230.

. . .

> In considering great weight points complaining of a jury's failure to find a fact, we must be mindful that a preponderance of the evidence did not convince the jury. We may not reverse merely because we conclude that the evidence preponderates toward an affirmative answer.

*Kirkpatrick*, 862 S.W.2d at 772.

### CONCLUSION

Despite our recognition as parents of the pain of a grieving mother, we are constrained to respect the parameters imposed upon an intermediate appellate court. While we can certainly conceive that Sergio's devastating injuries may be the result of someone's negligence, the jury's failure to find that any negligence of the nurses was a proximate cause of his injuries is not against the great weight and preponderance of the evidence. Issue Nos. One, Two, and Three are overruled. Having overruled all issues, we affirm the judgment of the trial court.