Kristine Lizabeth JONES f/k/a Freeda Jones and Paul Jones, Appellants,

v.

Dorothy LURIE, Appellee.

No. 14–98–01097–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 30, 2000.

Charles William Blount, Dallas, for appellants.

Jay D. Hirsch, Willie B. Daw III, Tina Snelling, Fred L. Shuchart, Houston, for appellees.

Panel consists of Justices SEARS, DRAUGHN, and LEE.[*]

## CORRECTED OPINION

ROSS A. SEARS, Senior Justice (Assigned).

On November 2, 2000, this Court delivered its opinion in the above-referenced case. We found it necessary to correct this opinion under appellants' point of error eighteen, challenging the cumulative effect of the errors, by adding our holding that appellants have failed to show harm. We herewith withdraw our original opinion and substitute the following corrected opinion to add this holding:

Kristine Lizabeth Jones f/k/a Freeda Jones (Kristine) and Paul Jones (Paul) appeal from a take-nothing judgment in their negligence suit against psychologist Dorothy Lurie (Dr. Lurie). In eighteen points of error, appellants contend: (1) the evidence is factually insufficient to support the jury findings (points one through thirteen); (2) the trial court erred in limiting the length of the trial (points fourteen and fifteen); (3) the trial court erred in permitting an attorney to appear and represent Dr. Lurie (point sixteen); (4) the trial court erred in prohibiting evidence of Kristine's competence and informed consent (point seventeen); and (5) the cumulative effect of these errors caused the rendition of an improper judgment (point eighteen). We affirm.

## BACKGROUND

Dr. Lurie received her Ph.D. in psychology from New York University in 1986. She was licensed as a psychologist on January 25, 1989, after having interned with other psychologists for two years. Kristine's first visit to Dr. Lurie was January 26, 1989, having been referred to Dr. Lurie by her physician, Dr. Levin. Three months later, Kristine told Dr. Lurie that her grandfather had sexually abused her when she was four years old. In 1990, Kristine also told Dr. Lurie that her parents took her to "satanic rituals" where she was physically and sexually abused by other cult members. In August 1990, Kristine told Dr. Lurie that she had vivid memories of murdering and cannibalizing babies, and of being impregnated by her father. She told Dr. Lurie that she had more than one hundred "inner children," or alternative personalities ("alters"), that told her about past abuses to her. The "alters" were given different names such as "Derf" and "Rabbit." The alters would argue amongst themselves, and would occasionally dominate her personality to the point Kristine would appear to be someone else. As a result of some of the alters talking to her, she would burn and cut herself. Kristine attempted suicide several times. She had a history of alcohol abuse starting when she was in high school.

Dr. Lurie treated Kristine off and on from January 1989 until November 1994. During Dr. Lurie's treatment, Kristine terminated Dr. Lurie's services several times. Dr. Lurie had Kristine admitted to several treatment centers and hospitals, and she was treated by several psychiatrists and therapists. Kristine was diagnosed by all of her psychiatrists, and Dr. Lurie, as having multiple personality disorder (MPD) and major depression. During her treatment by psychiatrists, she was given prescription medication such as Prozac for depression, Klonopin for anxiety, and Thorazine, a major tranquilizer.

Dr. Lurie stated that her therapy for the treatment of Kristine's MPD was based on her research of known authorities on the subject such as Dr. Frank Putnam,

---

[*] Senior Justices Ross A. Sears, Joe L. Draughn, and Norman Lee sitting by assignment.

a well-known psychiatrist. Following the treatment for MPD promulgated by The American Psychiatric Association, and Dr. Putnam, Dr. Lurie testified that she first established a trust relationship with Kristine, which took about one and one-half years. Her next goal was to establish communication with Kristine's alters, and tell them they must attend therapy and not harm themselves or the body they shared. In the next recommended step, Dr. Lurie would try to get the alters to cooperate with each other. Finally, Dr. Lurie would try to get a unified personality among the alters and Kristine. Dr. Lurie said her treatment along these lines complied with the standard of care that a reasonable and prudent psychologist would do or refrain from doing under the same and similar circumstances in the Harris County area. As a licensed psychologist, she neither prescribed any medication nor told Kristine what medicine to take; she did tell Kristine to take whatever medication her physicians prescribed for her. Essentially, Dr. Lurie's treatment was "talk therapy" whereby she would listen to Kristine, and try to work with her toward the goals recommended for treatment of MPD.

One of Kristine's expert witnesses was Dr. Terrence Campbell, a licensed psychologist from Michigan, who spent 80% of his time testifying as an expert in psychology and treatment of various psychological disorders. Dr. Campbell opined that Dr. Lurie deviated from the "appropriate" standard of care which caused damage to Kristine. By incorrectly treating Kristine, Dr. Campbell stated that Dr. Lurie "created a therapeutically induced post-traumatic stress disorder" in Kristine.

Dr. Howard Miller, a psychiatrist in Dallas who treated Kristine in 1992, testified that Dr. Lurie's treatment of Kristine between 1989 and 1994 met with the standard of care by a reasonable psychologist. Dr. Miller opined that Kristine suffered from MPD, and he stated that Dr. Lurie's treatment was in accordance with the ac-cepted standards of treatment for MPD promulgated by The American Psychiatric Association and was appropriate. He further stated that Kristine's post-traumatic stress syndrome (PTSD) was not caused by Dr. Lurie's therapy. He opined it could have been caused by her sexual and physical abuse as a child.

Dr. Harvey Rosenstock, a local psychiatrist, stated Dr. Lurie's treatment was proper, and that Kristine's PTSD was not caused by Dr. Lurie's therapy. He also opined the condition could have been caused by her child abuse and loss of her sister, Liz, who was Kristine's closest family member. Dr. Rosenstock also opined that no "informed consent" has to be given to a psychologist by a patient who is on an out-patient treatment basis. If the psychologist performs a special procedure, then he recommended that the psychologist obtain a consent agreement from the patient.

## FACTUAL SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE JURY FINDINGS

In points one through seven, appellants contend the evidence is factually insufficient to support the jury's finding of negligence by Kristine and no negligence by Dr. Lurie. Appellants also contest the factual sufficiency of the evidence to sustain the jury's findings to the conditional question no. 2, apportioning 100% of the fault to Kristine and zero percent to Dr. Lurie. Appellants do not challenge the legal sufficiency of the evidence to support these findings. In points eight, nine, and ten, appellants assert the evidence is factually insufficient to support the jury's finding of no damages for Kristine in question no. 3. In points eleven, twelve, and thirteen, appellants assert the evidence is factually insufficient to support the jury's findings of no damages for Paul for loss of consortium in question no. 4.

### Standard of Review

To prevail on their factual sufficiency challenges, appellants must show

that the adverse findings are against the great weight and preponderance of the evidence. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam). In conducting this review, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Id.* We must uphold the jury's finding unless it is so against the great weight and preponderance of the evidence as to be manifestly unjust or erroneous. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). *See also Knoll v. Neblett,* 966 S.W.2d 622, 629 (Tex.App.—Houston [14th Dist.] 1998, pet. denied).

## The Negligence Findings

■ Question No. 1 asked: "Did the negligence, if any, of those named below proximately cause the occurrence in question?" The jury answered "No" opposite Dr. Lurie's name, "No" opposite the other seven defendants' names, "No" opposite Paul's name, and "Yes" opposite Kristine's name. Question No. 2 asked: "For each person found by you to have caused the occurrence in question, find the percentage caused by," then listed the defendants, Kristine, and Paul. The jury answered "0" opposite all the listed parties with the exception of Kristine; the jury found that the "occurrence" was 100% caused by Kristine's negligence.

## Discussion

The evidence supporting the jury's findings of no negligence on the part of Dr. Lurie consists of Dr. Lurie's testimony, the testimony of Dr. Miller, Dr. Rosenstock, Dr. Blocher, Dr. Coons, Dr. Stockwell, and Dr. Decker. Drs. Miller and Rosenstock testified that Dr. Lurie's treatment met with the standard of care for practicing psychologists in this area from 1989 through 1994. Dr. Rosenstock opined that no "informed consent" has to be given to a psychologist by a patient who is on an out-patient treatment basis. If the psychologist performs a special procedure, then it he recommended that the psychologist obtain a consent agreement from the patient.

Dr. Thomas Blocher, a psychiatrist, testified that he examined Kristine on January 20, 1994, to determine if Kristine should be hospitalized because of her suicide threats. His initial diagnosis was that Kristine suffered from a "borderline personality disorder." He also stated she suffered from multiple personality disorder and depression. Dr. Blocher stated that Dr. Lurie's treatment of Kristine for MPD using the procedures recommended by the APA met with the standard of care for practicing psychologists.

Dr. Douglas Stockwell, a psychiatrist, started treating Kristine in February 1991 at Belle Park Hospital. Kristine had been admitted because she was showing signs of major depression. Kristine refused treatment and left Belle Park. On November 9, 1992, Dr. Lurie brought Kristine to Dr. Stockwell for examination. He used drugs such as sodium amytal and Ativan [anti-anxiety, anticonvulsant, and sedative] in evaluating his patients' problems. Dr. Stockwell stated that Dr. Lurie was present during the Ativan interviews which were conducted at Dr. Stockwell's office. Dr. Lurie wanted to relax Kristine "to help her deal with what she felt had come up in therapy," such as Kristine's suicidal tendencies and desire to kill herself before she reached her 30th birthday. During the Ativan interviews, Kristine talked about "Nazi mind-control" methods utilized on her. Dr. Stockwell felt Kristine's memories of such matters were delusional, and he encouraged Dr. Lurie to be "reality-based" in her therapy. Dr. Stockwell opined that Kristine had borderline MPD. Dr. Stockwell stated that Dr. Lurie was a competent psychologist, and that her treatment Kristine posed no danger to Kristine.

Dr. Philip Coons, a psychiatrist, was the author of many articles on MPD, and opined that Dr. Frank Putnam's book on the treatment of MPD was the best source for a therapist to obtain information regarding the treatment of MPD. Based on

his review of Dr. Lurie's records, he stated that her treatment of Kristine, utilizing the procedures recommended by Dr. Putnam, complied with the standard of care for psychologists from 1989 through 1994. Although he disagreed with Dr. Lurie's technique in questioning Kristine during the Ativan interviews, Dr. Coons testified her conduct did not fall below the standard of care, and it did not cause any harm to Kristine.

Dr. Norman Decker, a psychiatrist, examined Kristine in April 1994. At that time, he gave her a test called "structured clinical interview for dissociation." As a result of this test, Dr. Decker opined that Kristine suffered from multiple personality disorder, which is now called "dissociative identity disorder." He stated that Kristine thought she had more than 100 alter personalities. Dr. Decker did not read Dr. Lurie's medical records, and he expressed no opinion as to her treatment of Kristine conforming with the standard of care.

Dr. Campbell testified for two days, and his testimony covers over 500 pages. Dr. Campbell opined that Dr. Lurie breached the standard of care for a psychologist in the following ways: (1) by failing to obtain a written informed consent from Kristine according to the ethical principles for psychologists developed by the American Psychological Association published in 1981; (2) Dr. Lurie was not competent to treat Kristine; (3) Dr. Lurie was negligent in treating Kristine by having her believe her memories of satanic ritual abuse were true; (4) Dr. Lurie should have treated Kristine addressing Kristine's clinical condition concerning work-related problems, family-related problems, and health-related problems; and (5) Dr. Lurie failed to recognize Kristine's deterioration and refer her to other professionals. By causing Kristine to believe that she suffered sexual and physical abuse as part of cult rituals, and by having Kristine accept these memories as real, Dr. Campbell concluded that Dr. Lurie caused Kristine to have a "posttraumatic stress disorder." Dr. Campbell further opined that the recommended treatment for MPD promulgated by The American Psychiatric Association, and Dr. Putnam, was a "risky procedure."

Dr. Edwin Johnstone, a psychiatrist, testified that Dr. Lurie breached the standard of care for a psychologist by: (1) misdiagnosing Kristine's condition; (2) improperly treating Kristine; and, (3) failing to refer Kristine to other professionals. He further opined that all of Kristine's subsequent hospitalizations and treatments were necessitated by Dr. Lurie's improper treatment. Dr. Johnstone said there was no such thing as multiple personality disorder (MPD), and that Dr. Putnam and other professionals that wrote on MPD were "quacks."

Kristine testified that she told Dr. Lurie about the satanic ritual abuse when she first got out of Cottonwood Treatment Center in 1990. Kristine stated that Dr. Lurie told her she should believe her memories were true. She first attempted suicide in March 1992 by overdosing on her prescribed medications and vodka. She wanted to kill herself because "it was so hard believing all this stuff," and she thought she deserved to die. Thereafter, she attempted suicide ten more times. She stated that Dr. Lurie brought up the subject of Nazi brainwashing techniques, and Kristine thereafter believed that she had been brainwashed. She quit having sexual relations with her husband, Paul, because Dr. Lurie told her it would create bad memories. Kristine stated that she stopped believing she had a multiple personality disorder and had suffered from satanic ritual abuse about the time depositions were taken in this case. She stated that the therapy of the numerous doctors she saw destroyed her life.

Kristine was initially referred to Dr. Lurie by her medical doctor. Kristine needed help in dealing with the memory of past events in her life. Kristine had been sexually and physically abused by her grandfather, father, and brother. She had emotional disorders connected to the sexual

abuse. Kristine also had a history of eating disorders, alcoholism, depression, adjustment disorder, multiple personalities, and suicidal tendencies. Kristine was a very disturbed and mentally sick lady when she was referred to Dr. Lurie. Those conditions existed before Dr. Lurie ever saw Kristine.

As part of her treatment, Dr. Lurie referred Kristine to many other doctors for diagnosis and medication. Dr. Lurie also referred Kristine to many treatment centers and hospitals. However, Kristine consistently ignored what Dr. Lurie and other doctors told her. Kristine, against doctors orders, voluntarily left Belle Park Hospital, Stafford Medical Center, Spring Shadows Glen, Katy Medical Center, and Baywood Hospital. She also testified that she fired Dr. Starbranch, Dr. Decker, and refused to accept a referral by Clements Jackson. She admitted having quit Dr. Lurie several times.

By continuing to ignore the medical advice of all the doctors, as well as the staff at the various treatment centers and hospitals, Kristine made it impossible for Dr. Lurie or anyone else to effectively help her cope with her problems.

Because the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony, we may not substitute our judgment for that of the jury's simply because we may disagree with the jury's findings. *Herbert v. Herbert,* 754 S.W.2d 141, 142 (Tex.1988); *Bradley v. Rogers,* 879 S.W.2d 947, 953 (Tex.App.—Houston[14th Dist.] 1994, writ denied). In weighing the testimony of Kristine and her experts supporting negligence against the testimony of Dr. Lurie and her experts refuting negligence, together with the medical records in evidence, we hold that the jury's finding of no negligence on the part of Dr. Lurie was not against the great weight and preponderance of the evidence. *See also Winkle v. Tullos,* 917 S.W.2d 304, 317–18 (Tex. App.—Houston[14th Dist.] 1995, writ denied) (conflicting expert testimony on use of tourniquet during knee surgery; jury's failure to find negligence supported by legally and factually sufficient evidence); *Merckling v. Curtis,* 911 S.W.2d 759, 763–67 (Tex.App.—Houston[1st Dist.] 1995, writ denied) (detailed evidence in opinion was legally and factually sufficient to support finding of no negligence on part of general surgeon in diagnosing need for hernia surgery); *Crawford v. Hope,* 898 S.W.2d 937, 942–43 (Tex.App.—Amarillo 1995, writ denied) ("battle of experts" in suit against physician for terminating patient's seizure medications and replacing them with ineffective medication; weight of evidence was for jury, and finding of no proximate cause for treating physician was not manifestly unjust or clearly wrong). *See also Magee v. Ulery,* 993 S.W.2d 332, 336 (Tex.App.—Houston[14 Dist.] 1999, no pet.)

The trial court's charge instructed the jury, in pertinent part:

"NEGLIGENCE," when used with respect to the conduct of Kristine Lizabeth Jones f/k/a Freeda Jones means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

We hold there is sufficient evidence to sustain the jury's finding in question 1 that Kristine was negligent. *See Eoff v. Hal and Charlie Peterson Foundation,* 811 S.W.2d 187, 191 (Tex.App.—San Antonio 1991, no writ). Because the jury found no negligence on the part of *any* of the defendants, and found *only* Kristine was negligent, the jury correctly attributed 100% causation to Kristine in question 2. We overrule appellants' points of error one, two, three, four, five, six, and seven challenging the factual sufficiency of the evidence to support the jury's findings in Question 1 and Question 2.

## The Findings of Zero Damages

■ In points eight, nine, ten, eleven, twelve, and thirteen, appellants challenge the factual sufficiency of the evidence to support the jury's findings of zero damages for Kristine and Paul in Questions 3 and 4.

■ Appellants overlook the well-established rule of law that a finding of zero damages is immaterial in the absence of liability findings. *See, e.g., Southern Pine Lumber Co. v. Andrade,* 132 Tex. 372, 124 S.W.2d 334, 335 (1939); *Winkle v. Tullos,* 917 S.W.2d 304, 318 (Tex.App.—Houston [14th Dist.] 1995, writ denied); *Ramsey v. Lucky Stores, Inc.,* 853 S.W.2d 623, 635 (Tex.App.—Houston [1st Dist.] 1993, writ denied). Because the jury found no liability on the part Dr. Lurie, it was not error for them to award zero damages. We overrule appellants' points of error eight, nine, ten, eleven, twelve, and thirteen.

## LIMITING THE LENGTH OF THE TRIAL

■ In points fourteen and fifteen, appellants assert the trial court erred in arbitrarily limiting the trial to two weeks, thereby limiting appellants' cross-examination of defendant's witnesses. Appellants argue that restricting the trial time to nine days was an arbitrary and unreasonable limitation on appellants' right to develop their case at trial.

Appellants made no complaint to the trial court about the length of time. Appellants filed a pre-trial order indicating the trial would last seven to eight days. In their brief, appellants do not state how they were harmed by the time limitations, and argue only that "the arbitrary restrictions were harmful as expressed in the jury's verdict." No mention is made of any loss of testimony or evidence that would cause the rendition of an improper judgment.

■ A presiding judge has broad discretion with respect to the manner in which control of a trial is maintained and as to the examination of witnesses and a judgment will not be reversed unless probable prejudice is shown. Tex.R.Evid. 611(a), (b); *Texas Emp. Ins. Ass'n v. Garza,* 557 S.W.2d 843, 845 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.).

Appellants have not shown in what way this ruling of the trial court harmed their cause. That being true, they have not shown the requisite probable prejudice to them because of the ruling. Appellants' points of error fourteen and fifteen are overruled.

## THE APPEARANCE OF APPELLEE'S LAWYER

■ In point sixteen, appellants contend the trial court erred in permitting attorney Willie Ben Daw III to enter his appearance and represent Dr. Lurie. Mr. Daw previously represented Karen Hutchins, one of the settling defendants in this case. Appellants argue that Mr. Daw's representation of Dr. Lurie was adverse to the interests of Daw's former client, Karen Hutchins, and he should not have been allowed to proceed as Dr. Lurie's attorney. Appellants did not object to Mr. Daw's appearance and representation, and they filed no motion to disqualify Mr. Daw. They complain of this matter for the first time on this appeal.

■ Attorney conflicts of interest in civil cases are governed by the Texas Disciplinary Rules of Professional Conduct, and complaints based on violations of those rules are waived if not timely raised. *See Vaughan v. Walther,* 875 S.W.2d 690, 691 (Tex.1994); *Arteaga v. Texas Dept. of Protective and Regulatory Services,* 924 S.W.2d 756, 762–763 (Tex.App.—Austin 1996, writ denied). Appellants have therefore waived any error by failing to bring the alleged conflict to the attention of the trial court. Furthermore, appellants were never represented by Mr. Daw, and they have no standing to complain of his representation of Dr. Lurie. *See Adams v.*

*Reagan,* 791 S.W.2d 284, 291 (Tex.App.—Fort Worth 1990, no writ); *Pioneer Natural Gas Co. v. Caraway,* 562 S.W.2d 284, 290 (Tex.Civ.App.—Eastland 1978, writ ref'd n.r.e.). Appellants' point of error sixteen is overruled.

## EVIDENCE OF COMPETENCY AND INFORMED CONSENT

 In point seventeen, appellants contend that the trial court erred in prohibiting appellants from presenting evidence relating to competency and informed consent. Appellants' counsel asked Paul if Dr. Lurie ever had conversations with him concerning the mental competence of Kristine. Appellee objected on the grounds of relevance, and the trial court sustained the objection.

There is no bill of exceptions or other offer of proof in the record showing the substance of the excluded evidence. Error may not be based on a ruling that excludes evidence unless the substance of the evidence was made known to the court by offer of proof. Tex.R.Evid. 103(a)(2). When a trial court excludes evidence, a failure to make an offer of proof waives any complaint about the exclusion on appeal. *Chubb Lloyds Ins. Co. of Texas v. Kizer,* 943 S.W.2d 946, 949 (Tex.App.—Fort Worth 1997, writ denied). By failing to make an offer of proof, appellants have waived this complaint. We overrule appellants' point of error seventeen.

## THE CUMULATIVE EFFECT OF THE ERRORS

In point eighteen, appellants contend that the cumulative effect of the errors shown in this appeal was "reasonably calculated to and probably did cause the rendition of an improper judgment."

Multiple errors, even if considered harmless taken separately, may result in reversal and remand for a new trial if the cumulative effect of such errors is harmful. Tex.R.App.P. 44.1(a)(1), (2); *Owens-Corning Fiberglas Corp. v. Malone,* 916 S.W.2d 551, 570 (Tex.App.—Houston (1st Dist.) 1996), *affirmed,* 972 S.W.2d 35 (Tex.1998). Before we may reverse a judgment and order a new trial, we must determine that the error committed by the trial court was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Id.* The appellants must show that, based on the record as a whole, but for the alleged errors, the jury would have rendered a verdict favorable to them. *Id.* Appellants have failed to show that but for the cumulative effect of the errors, if any, the jury would have rendered a verdict favorable to them.

We overrule appellants' point of error eighteen.

We affirm the judgment of the trial court.