NO KEY WORDS





COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 02-03-006-CV
 
  
LEIGHIA 
HUTCHISON, INDIVIDUALLY                                    APPELLANTS
AND 
AS REPRESENTATIVE OF THE ESTATES
OF 
CODY EDWARD HUTCHISON AND
ELIZABETH 
PAIGE HUTCHISON AND AS NEXT
FRIEND 
OF JONATHAN THOMAS HUTCHISON,
LAURA 
BLEVINS, DONNY C. DRENNON,
RANDY 
EDWARD HUTCHISON, AS HEIR AND
PERSONAL 
REPRESENTATIVE TO THE
ESTATES 
OF CODY EDWARD HUTCHISON
AND 
ELIZABETH PAIGE HUTCHISON,
AND 
SHARON HUTCHISON AS ASSIGNEE
 
V.
 
VINCENT 
PHARRIS                                                                   APPELLEE
D/B/A 
MURRAY & MASSIE BUTANE
 
 
------------
 
FROM 
THE 97TH DISTRICT COURT OF CLAY COUNTY
 
------------
 
OPINION
 
------------
 
INTRODUCTION
 
        This 
suit involves the tragic deaths of two children resulting from a fire that also 
injured three adults and destroyed a mobile home.  Appellants Leighia 
Hutchison, individually, as next friend of Jonathan Hutchison, and as 
representative of the estates of Cody and Elizabeth Hutchison; Laura Blevins; 
and Donny Drennon appeal from a take-nothing judgment in favor of Appellee 
Vincent Pharris d/b/a Murray & Massie Butane (Murray & Massie).  
Appellants raise three issues, complaining that (1) there is legally or 
factually insufficient evidence to support the jury’s finding that Blevins and 
Hutchison were contributorily negligent in causing the fire or deaths; (2) the 
jury’s failure to find negligence of Murray & Massie in connection with 
the mobile home’s propane tank is against the overwhelming weight and 
preponderance of the evidence; and (3) the jury’s failure to award damages to 
Appellants is against the overwhelming weight and preponderance of the evidence.[1]
FACTUAL BACKGROUND
A. The Fire
        At 
about 9:00 a.m. on March 9, 1994, a fire engulfed and totally destroyed a 
double-wide mobile home at Lake Arrowhead, Texas.  Laura Blevins and her 
husband had bought the mobile home in 1992.  Laura and her husband had 
separated, and she had lived in the mobile home for a little more than a year at 
the time of the fire.  The propane tank and line were already hooked up 
when they bought the trailer.  Blevins did not know who had previously 
serviced the tank.  When they first bought the mobile home, she had called 
John’s Tractor & Propane to check and service the tank.
        Murray 
& Massie first made an “out-of-gas” call to the residence on November 2, 
1993.  Its gas serviceman performed a monometer or “leak” test of the 
regulator, made a visual exam, reconnected the line, and went into the house and 
lit the pilot lights after filling the tank.  Everything checked out.  
Murray & Massie again provided propane service and filled the tank on 
November 2, 1993, December 6, 1993, January 5, 1994, and January 21, 1994.  
When Murray & Massie was not paid for those last three deliveries, it quit 
delivering gas.  When Blevins once again ran out of gas in March, shortly 
before the fire, she called Calvin Gas Company for service.  Calvin Gas was 
the last dealer to fill Blevins’s propane tank before the fire.  Calvin 
Gas filled the tank a few days before the fire but did not inspect the system or 
light the pilot lights.[2]
        At 
the time of the fire, the mobile home was occupied by Blevins, her son Donny, 
her daughter Leighia Hutchison, and Hutchison’s three children.  Cody was 
three years of age, Jonathan was eighteen months old, and Elizabeth was five 
months old.  Blevins had turned on the burners of her kitchen stove to warm 
the home when she returned from work around 4:00 a.m.  There was no other 
heat, as the pilot lights to the furnaces had been unlit for several days.
        Blevins 
had coffee and a couple of cigarettes and left the burners on when she retired 
to her bedroom after heating a bottle for her granddaughter, Elizabeth. Leighia 
awoke and took the three children into another bedroom to watch TV after the two 
boys had cereal.  Donny was asleep in the third bedroom.  Leighia went 
back to sleep with Elizabeth lying beside her as Jonathan and Cody left the 
bedroom, ostensibly to use the bathroom, shutting the bedroom door behind 
them.  No one smelled gas.
        Blevins 
heard the boys go into the kitchen.  A few minutes later, Leighia heard 
Cody scream.  Blevins came out of her bedroom and saw what she would later 
describe as a “fireball” above the stove that “swooshed” back toward the 
laundry room, knocking her down.  The boys ran to Blevins, who crawled with 
Jonathan through thick smoke and heat to the front door and onto the 
porch.  Cody ran back toward the bedroom, and she never saw him 
again.  According to Blevins, an unidentified man drove up to the scene 
with his wife, who took Jonathan to safety while the man held Blevins back from 
re-entering the mobile home to find the other two children.
        Blevins’s 
daughter, Leighia, testified that she awoke and opened the door to the hall, but 
it was filled with black smoke, so she went to the window and opened it, 
whereupon, she said, she was pulled through the window by Blevins and the same 
unidentified man, leaving five-month-old Elizabeth asleep next to the same 
window.  Blevins’s son, Donny, awoke and opened his door to smoke and 
flames, with things falling down from the ceiling.  He briefly saw Cody’s 
legs through the smoke, and then someone called Cody, who ran back the other 
direction.  Donny broke a window with a chair and crawled through it.  
He did not try to re-enter the home as every room was on fire.  Both Cody 
and Elizabeth died in the fire.
B. The Suit
        Appellants 
originally sued the manufacturers of the mobile home and heating system and 
Calvin Gas Company for injuries suffered by the adults and wrongful death and 
survival actions for the deaths of Cody and Elizabeth.  Other defendants, 
including Murray & Massie, were later added to the suit.[3] 
 After several claims were settled, the case ultimately proceeded to trial 
in September 2002 against Murray & Massie as the sole remaining defendant.
        Appellants’ 
theory of liability against Murray & Massie at trial was that the propane 
tank’s regulator, which was more than fifteen years old, had “worn out” 
and failed, resulting in increased pressure on the furnace control valve, which 
in turn allowed propane gas to leak into the home and to get ignited by the 
stove burners.  Appellants claimed Murray & Massie was negligent and 
violated the DTPA in breaching a warranty to perform services in a workmanlike 
manner and in failing to replace the regulator or advise Blevins that the 
regulator was more than fifteen years old.
        Following 
a week-long trial, the jury returned a verdict answering broad-form jury 
question number one “yes” as to whether negligence of Leighia Hutchison and 
Laura Blevins was a proximate cause of the occurrence in question, and “no” 
as to whether negligence of the furnace manufacturer, Calvin Gas Co., or Murray 
& Massie was a proximate cause of the occurrence.  In answer to jury 
question number two, the jury apportioned the percentage of causation 
attributable to Leighia Hutchison at 30 percent, the percentage attributable to 
Laura Blevins at 70 percent, and the percentage attributable to Murray & 
Massie and the other two named parties at zero.[4]  
The jury questions on damages were conditioned upon affirmative findings on the 
liability issues and, consequently, were not answered.  Appellants appeal 
from a take-nothing judgment on the verdict after denial of their motion for new 
trial.
C. The Expert Testimony
        1.     The 
Investigation
        Kenny 
Lemons, a fire investigator certified by the State, was a deputy with the Clay 
County Sheriff’s office.  He arrived at the scene as firemen were 
extinguishing the blaze, and took charge of the scene after the fire was out to 
determine the origin and cause of the fire.  His purpose was to find the 
approximate area of origin of the fire.  He questioned people at the scene, 
including firemen, a neighbor, the local fire chief, and Leighia 
Hutchison.  He did not interview Blevins, but another fireman told him that 
she had described hearing a “whoosh” or explosion.  The overwhelming 
majority of the wiring was destroyed, according to Lemons, so that he was not 
able to examine it.
        The 
furnace from the laundry room had ended up outside the home, upside down.  
Lemons testified that he flipped it over and put it back into place beside the 
washer in what had been the laundry room.  He described the furnace as an 
old unit with rusted parts, and he understood that it was “inoperable” and 
that the family did not even use it.  In Lemons’s opinion, the fire’s 
most likely origin was the furnace, and the cause was “some kind of gas 
leak” in the area of the laundry room, based on the high damage to the beams 
and appliances in that area.  He testified that the source of the leak was 
probably the bottom of the furnace.  Once he determined that the fire was 
“accidental,” he did not investigate further in detail.
        Lemons 
called David Duke, a lieutenant and fire and arson investigator with the Wichita 
Falls Fire Department, who arrived at about 11:00 a.m. and assisted Lemons in 
finding the older child’s body and in determining the origin and cause of the 
fire.  When Lieutenant Duke arrived, the little girl’s body had already 
been recovered by another fireman in the front bedroom.  The remaining 
child was found in the hallway outside another bedroom.  Lieutenant Duke 
spent six and one-half hours at the scene, five hours of which were spent 
determining the origin and cause of the fire.
        Witnesses 
had first seen the fire in the northwest corner of the trailer near the laundry 
room.  Duke confirmed that the fire appeared to have burned longer and 
hotter in that area, which he explained was an indicator of the location of 
origin.  He testified that the overwhelming majority of the wiring was 
destroyed, and he was unable to examine it.  He was also unable to look at 
burn patterns or “vee” patterns because there was total destruction.  
The bottoms of the washer and dryer were heavily distorted. Duke and Lemons 
ruled out arson.  Duke confirmed that both he and Lemons believed the cause 
was “some sort of gas leak” based on significant heating below the 
furnace.  He believed that the bottom of the furnace ignited and was the 
seat of the fire.  He agreed that, if a witness said a “fireball” came 
off the stove top and migrated back to the furnace, that would put the point of 
origin in the kitchen.
        2.     The 
Regulator
        Michael 
Chaney, an independent certified fire investigator hired by Appellants, and 
Robert Ross, an expert consulting engineer, testified for Appellants about the 
purpose and function of the regulator on the propane tank.  They explained 
that a propane tank has gas under pressure from 20 to 40 pounds per square inch 
(psi), depending on the temperature.  The maximum pressure on the furnace 
control valve is specified by the furnace manufacturer at 14 inches “water 
column,” which equates to ½ psi.  The manufacturer’s brochure warns 
that the control valve could be damaged if the pressure exceeds the range of 11 
to 14 inches.  Ross testified that, if the control valve is over-pressured 
beyond 6 or 7 psi, the furnace control valve will at some point leak gas.  
The only protection from pressure on the valve is the regulator on the 
tank.  The regulator keeps the pressure at a safe level.  The 
regulator on this tank was manufactured by Fisher, date stamped as manufactured 
“10-73.”  It was undisputed that the fire occurred twenty-one years 
after the regulator was manufactured.
        Ross 
described Fisher’s warnings in its manuals, including the risk of fire and 
explosion from old, unmaintained regulators.  Since the 1970's, he said, 
Fisher had issued materials to trade publications and dealer letters concerning 
the need to maintain regulators on tanks.  In 1989, Fisher issued stronger 
warnings recommending replacement of regulators that were more than fifteen 
years old.  A large insurer of propane dealers had likewise issued 
recommended standards for its insureds, recommending replacement of regulators 
over fifteen years old if they were exposed to elements or showed signs of 
deterioration.
        Ross 
testified that these recommendations were made because the “seat” of the 
regulator will wear out and become subject to producing higher pressures.  
The seat is made of synthetic rubber that needs to be pliable, and it will 
become brittle with age, allowing debris, such as scale from the tank or piping, 
to enter the regulator and cause it to malfunction, permitting gas to enter the 
home.  However, he additionally testified that a blocked vent from insects 
or freezing precipitation may also cause a regulator to fail if the vent is not 
either protected by a bonnet or hood or turned to face downward.
        3.     Standard 
of Care
        Ross 
testified for Appellants on the standard of care of a reasonable propane dealer 
in servicing a propane tank.  He testified that, for out-of-gas calls, the 
National Fire Protection Association promulgated the “NFPA-54” procedure 
requiring a dealer to shut off the system, check the appliance, pressure check, 
and only do business with a customer if the propane system complies.  
However, he acknowledged that The Texas Railroad Commission regulates propane 
gas dealers in Texas.  NFPA-54 was not adopted in Texas by the Railroad 
Commission until after 1993, according to Ross, and yet Murray & Massie not 
only complied with but exceeded the NFPA-54 procedure when it serviced 
Blevins’s tank.  He knew of nothing Murray & Massie did that was a 
violation of any then-existing regulation of the Railroad Commission.  
However, he said, Calvin Gas had not complied with NFPA-54 and should have made 
sure that the pilots were on and checked the pressure when they serviced the 
tank shortly before the fire, but they had refused.  In Ross’s opinion, 
Calvin Gas was negligent.
        Nevertheless, 
in Ross’s opinion, Murray & Massey should also have changed out the 
regulator because it was more than fifteen years old in 1993, and Murray & 
Massie was thus negligent, as was Calvin Gas.  Ross further testified that 
the regulator, as shown in a photograph of the tank and system taken three years 
after the fire, had no bonnet or hood and had therefore been “exposed to the 
elements.”  Additionally, the vent was not turned to point down, so that 
in his opinion, the vent was probably also blocked by freezing rain or 
insects.  In his opinion, each dealer had some “blame.”
        Vincent 
Pharris, owner of Murray & Massie, had been in the business of propane gas 
service since 1966 and was licensed by the Railroad Commission as a dealer in 
1968.  Pharris testified he knows and complies with the standard of care 
for reasonably prudent propane dealers in Texas.  He replaces several 
hundred regulators a year, making a profit from those sold, but also giving 
regulators to customers when needed.  Pharris testified a reasonably 
prudent propane dealer would not necessarily change out a regulator that was 
over fifteen years old; replacement is not mandatory and the Railroad Commission 
does not require it.  He would test it, and replacement would be 
“automatic” if the pressure went over 14 inches and would not adjust down or 
would creep back up.  In that case, he would recommend that the customer 
permit him to replace it and would refuse to service the system and report the 
customer to the Railroad Commission if he/she refused permission.
        Pharris 
further testified he was not a Fisher dealer in 1993 and did not receive their 
dealer materials, but that he serviced tanks with Fisher regulators and knew 
Fisher recommended replacement of regulators more than fifteen years old. He 
also testified he told customers of Fisher’s recommendations and, if a gas 
deliveryman did not tell a customer of the manufacturer’s recommendation, in 
his opinion, it would have been “less than what he would expect.”  
Murray & Massie stipulated that its gas deliveryman did not advise Blevins 
of Fisher’s recommendation.  Pharris testified he personally had not been 
out to the Blevins mobile home and he had not known the age of the 
regulator.  However, the morning after the fire, Pharris said, he went to 
the scene and examined the regulator on the propane tank.  It had a bonnet 
protecting it and good paint still on it.  In his opinion, the regulator 
had not been exposed to the elements.  The gas serviceman who had first 
serviced the tank for Murray & Massie testified that he always looked for 
any deterioration or damage, and if a regulator did not have a hood or bonnet, 
he would put one on.
        James 
Peterson, a forensic mechanical engineer hired by the defense, testified that, 
in his opinion, Murray & Massie acted as a reasonably prudent propane gas 
dealer under the standards required in Texas.  By complying with the 
NFPA-54 standard for leak-checking on out-of-gas calls, which had not yet been 
adopted in Texas at that time, he agreed with Ross, Murray & Massie exceeded 
the then-existing Texas standard.  Peterson understood Murray & 
Massie’s gas deliveryman obtained a pressure reading of 11 inches when he 
serviced the tank in 1993, and in his opinion, the regulator never showed 
aberrant pressure.
        Peterson 
testified that he sits on National Propane Gas Association committees involved 
with technical standards and safety, and those committees have never adopted or 
recommended replacement after fifteen years as a standard.  He had also 
worked for one of the companies involved in establishing the fifteen-year 
recommendation.  Peterson described the fifteen-year recommendation as 
merely a “consensus” number for replacement if a dealer had not been 
regularly doing leak checks or maintaining the system.  It was not a safety 
standard adopted by the industry.
ANALYSIS
        Jury 
question number one asked the jury:  “Did the negligence, if any, of 
those named below, proximately cause the occurrence in question?”  Below 
the question was a series of pattern jury charge definitions for 
“negligence,” “ordinary care” and “proximate cause,” followed by the 
instruction:  “Answer “Yes” or “No” for each of the following: 
”a. Leighia Hutchison; b. Laura Blevins; c. Evcon d/b/a The Coleman Company, 
Inc.; d. Calvin Gas Co., Inc.; e. Murray & Massie Butane.”  To the 
right of each name listed was a blank in which the jury wrote “yes” for 
Leighia Hutchison and Laura Blevins, and “no” for Murray & Massie and 
the other two named companies.  Jury question number two inquired as to the 
percentage of responsibility of the same parties.  These jury questions 
were standard broad-form, pattern jury form questions that submitted both 
negligence and proximate cause, together with contributory negligence of Leighia 
Hutchison and Laura Blevins in the same question.[5]
A. Contributory Negligence Finding
        Appellants 
complain by their first issue that there is legally or factually insufficient 
evidence to support the jury’s findings in answer to jury question number one 
and two that any negligence of Leighia Hutchison or Laura Blevins caused the 
fire or the deaths of Elizabeth and Cody.  Specifically, Appellants argue 
that only fire investigators certified by the Texas Commission on Fire 
Protection are authorized to determine the cause and origin of fires.[6]  Appellants contend that, of the four certified fire 
investigators who testified, two attributed the cause of the fire to a gas leak 
near the laundry room and the fourth, who testified on behalf of Murray & 
Massie, was of the opinion that the fire should have been categorized as 
“undetermined.”  Appellants argue that there is no evidence or 
factually insufficient evidence that Blevins and Hutchison were negligent 
because no witness testified as to any negligence on their part, and the fire 
rapidly spread and totally destroyed the mobile home in fifteen to twenty 
minutes, during which time the adults would likely have been disoriented while 
attempting to escape.  Appellants further argue that no expert testified 
that the fire was caused by Blevins or Hutchison.[7]
1. Waiver
        Murray 
& Massie first argues that Appellants waived their complaint as to the 
negligence or causation findings against Blevins and Hutchison by failing to 
object to the submission of those issues.  We disagree.  “A claim 
that the evidence was legally or factually insufficient to warrant the 
submission of any question may be made for the first time after verdict . . . 
.” Tex. R. Civ. P. 279.  It is well 
settled that an attack based on legal sufficiency of evidence to support a jury 
finding may be preserved for appeal in any of five ways: (1) objection to the 
charge; (2) motion for directed verdict; (3) motion to disregard the finding; 
(4) motion for judgment notwithstanding the verdict; or (5) motion for new 
trial.  Cecil v. Smith, 804 S.W.2d 509, 510-11 (Tex. 1991).  
Indeed, a complaint of factual insufficiency of evidence not only may but must 
be made only after verdict by a motion for new trial to preserve error for 
appeal in a jury case.  Tex. R. Civ. 
P. 324(b)(2).  Appellants properly preserved error both as to legal 
and factual sufficiency of the evidence by raising those complaints after 
verdict in their motion for new trial.[8] However, we 
conclude that any error in the jury’s finding of contributory negligence is 
harmless as discussed below.
2. Harmless 
Error
        Appellants 
complain in their second issue that the jury’s finding of no negligence on the 
part of Murray & Massie is against the overwhelming weight and preponderance 
of the evidence.  However, we likewise conclude that any error in this 
finding is harmless.  We are persuaded by Murray & Massie’s harmless 
error argument that the jury’s refusal to find proximate cause as to any 
negligence on their part is sufficient to support the judgment.  Boatland 
of Houston, Inc. v. Bailey, 609 S.W.2d 743 (Tex. 1980).
        Whether 
Blevins and Hutchison were contributory negligent was submitted in jury question 
number one along with whether Murray & Massie was negligent, and the same 
question also inquired as to whether the negligence, if any, of those parties 
was a proximate cause of the occurrence.  The jury’s answer of 
“no” as to Murray & Massie could have been based upon the jury’s 
refusal to find either that Murray & Massie was negligent or that any such 
negligence was a proximate cause of the occurrence.  Additionally, 
the jury attributed “0” percentage of causation to Murray & Massie in 
answer to question number two.  It is unnecessary to address the legal or 
factual sufficiency of evidence to support the jury’s findings of negligence 
of Blevins and Hutchison or the jury’s failure to find Murray & Massie 
negligent if we hold that Appellants failed to challenge the negative finding as 
to proximate cause or that the finding is supported by the evidence.  Id. 
at 750; see Tex. R. App. 
P. 44.1(a)(1) (reversal precluded unless error complained of probably resulted 
in an improper judgment).
        Appellants 
respond that an erroneous finding is harmless only if answers to “other” 
jury questions support the judgment whereas here, there were no findings of 
negligence and proximate cause in answer to “other” questions because those 
elements, along with contributory negligence, were all submitted in the same 
jury question.  But the harmless error rule applies in cases such as this, 
where a broad-form jury question encompasses both the complained of finding and 
the other unchallenged findings.  See, e.g., McRae v. Echols, 
8 S.W.3d 797, 801 (Tex. App.—Waco 2000, pet. denied) (jury’s negative answer 
to broad-form submission of negligence and proximate cause in same question 
could have been based on finding that defendant’s negligence was not a 
proximate cause of collision); Carr v. Jaffe Aircraft Corp., 884 S.W.2d 
797, 799 (Tex. App.—San Antonio 1994, no writ) (negative answer to question 
asking whether negligence of defendant proximately caused occurrence in question 
could have been based on failure to find either negligence or proximate cause); Yap 
v. ANR Freight Sys., Inc., 789 S.W.2d 424, 428 (Tex. App.—Houston [1st 
Dist.] 1990, no writ) (negative finding that defendant’s negligence was not a 
proximate cause could have been based on jury’s belief that any negligence was 
not a cause of event).
        Appellants 
did not raise any issue in their original brief complaining of the jury’s 
refusal to find proximate cause as to any negligence of Murray & Massie.[9] Absent such a complaint, the jury’s refusal to find 
proximate cause is sufficient to support the judgment, regardless of the 
contributory negligence finding and regardless of whether the jury properly 
failed to find Murray & Massie negligent.  See Boatland, 609 
S.W.2d at 750; Daves v. Comm’n for Lawyer Discipline, 952 S.W.2d 573, 
580 (Tex. App.—Amarillo 1997, pet. denied) (alleged error held harmless when 
jury’s findings as to other issues are sufficient to support judgment); Harris 
v. Gen. Motors, Corp., 924 S.W.2d 187, 188 (Tex. App.—San Antonio 1996, 
writ denied) (failure to challenge no-damages finding rendered any error 
regarding liability findings harmless).[10]
        Although 
Appellants did not explicitly complain of the jury’s refusal to find proximate 
cause in their original brief, Murray & Massie raised and fully argued the 
evidence in their response to show that the jury’s finding of causation is not 
against the overwhelming weight and preponderance of the evidence.  
Appellants, in turn, addressed this evidentiary issue in their reply 
brief.  Ordinarily, an issue raised for the first time on appeal in a reply 
brief is waived.[11]  However, the parties 
joined issue when Murray & Massie fully argued the evidence supporting the 
negative finding to proximate cause in its response brief and Appellants 
replied.  Therefore, we will consider and address the issue as properly 
before us.[12]  If the jury’s refusal to find 
proximate cause as to any negligence of Murray & Massie is not against the 
overwhelming weight and preponderance of the evidence, then that negative 
finding is sufficient to support the judgment.
B. Proximate Cause
        The 
elements of a negligence cause of action are a legal duty, a breach of that 
duty, and damages proximately caused by the breach.  IHS Cedars 
Treatment Center of DeSoto, Texas, Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 
2004) (citing D. Houston, Inc. v. Love, 92 S.W.3d 450, 454 (Tex. 
2002)).  To establish proximate cause, it is a plaintiff’s burden to 
prove two elements, cause-in-fact and foreseeability.  Id.  Cause-in-fact 
is established when the act or omission was a substantial factor in bringing 
about the injuries, and without it, the harm would not have occurred.  Id. 
at 799; Lear Siegler, Inc. v. Perez, 819 S.W.2d 470, 472 (Tex. 
1991).  The jury’s negative answer to jury question number one as to 
Murray & Massie represented a refusal to find from a preponderance of the 
evidence that negligence of Murray & Massie was a proximate cause of the 
occurrence.  See Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 
(Tex. 1989).
1. Standard of Review
        When 
a party challenges the factual sufficiency of evidence regarding a refusal to 
find on an issue upon which that party bore the burden of proof, the party must 
demonstrate that the adverse finding is against the great weight and 
preponderance of the evidence.  Dow Chem. Co. v. Francis, 46 S.W.3d 
237, 241 (Tex. 2001); Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); W. 
Wendell Hall, Standards of Review in Texas, 29 St. Mary’s L.J. 351, 484 (2002).  
We examine the entire record, first examining whether there is some evidence in 
favor of the challenged finding and, if so, whether the finding is so contrary 
to the overwhelming weight and preponderance of the evidence as to be manifestly 
wrong and unjust.  Dow, 46 S.W.3d at 241; Cain, 709 S.W.2d at 
176.  Because the jury is the sole judge of the credibility of the 
witnesses and the weight to be given to their testimony, we may not substitute 
our judgment for that of the jury simply because we may disagree with its 
findings.  Herbert v. Herbert, 754 S.W.2d 141, 142 (Tex. 1988); Jones 
v. Lurie, 32 S.W.3d 737, 740-41 (Tex. App.—Houston [14th Dist.] 
2000, no pet.).  We may not reverse simply because we conclude that the 
evidence “preponderates toward” an affirmative answer.  Herbert, 
754 S.W.2d at 144.  We may reverse only when the “great weight” of the 
evidence supports an affirmative answer.  Id.
2. Causation Evidence
        Appellants 
contend that the fire investigators certified by the State each testified that 
the fire originated at the furnace control valve.  We agree that four 
expert witnesses testified who were certified as fire investigators, but we 
disagree with Appellants’ characterization of their testimony.[13]  Appellants argue that Deputy Kenneth Lemons and 
Lieutenant David Duke both testified the fire was caused by a propane leak at 
the furnace control valve.  But neither Duke nor Lemons mentioned the 
furnace control valve.  Appellants’ expert, Michael Chaney, was also a 
certified fire investigator, formerly with the Wichita Falls Fire 
Department.  Chaney reviewed Lemons’s and Duke’s reports, did his own 
investigation of the scene of the fire, which still stood unchanged after two 
years, and examined the materials in storage and the depositions of witnesses 
and reports of other experts.  Chaney agreed with Lemons and Duke that the 
cause of the fire may have been a gas leak in the laundry room.  He 
understood that there were open flames in the kitchen and that a witness saw a 
“fireball.”  He placed the origin of the fire at the stove.  He 
theorized that the heated air in a cold room would draw the gas to the stove, 
where it ignited and then shot back toward the source.  Chaney also 
explained that the gas had mercaptan added to provide a very “stinky” odor, 
but testified that the adults may not have smelled it if they were in other 
rooms and the leak developed suddenly.
        Of 
the four certified fire investigators who testified, only Michael Chaney 
addressed any potential role of the furnace control valve.  While he 
reviewed another expert’s opinion that the “cock” in the control valve was 
the “weak link,” he did not know where the control valve was, could not say 
how the control valve failed, and would defer to another expert on that 
subject.  And failure of the control valve was not in issue as to any 
liability of Murray & Massie, in any event.
        More 
importantly, Chaney addressed the role of the regulator on the propane gas tank, 
which was the specific basis for Appellants’ theory of negligence against 
Murray & Massie.  In his opinion, the probable cause of the fire was 
leaking gas from some point of ignition in the home.  In his further 
opinion, the most likely cause of the leak was that the Fisher regulator that 
was outside the age of replacement had failed, allowing high pressure to come 
out of the tank, and then the control valve had failed, so that gas leaked 
inside the home.
        However, 
Chaney acknowledged that he is not a regulator expert.  He stated that 
Appellants hired a different expert to test the regulator, and he would defer to 
another witness who would talk about the regulator.  He did not know how 
the regulator would have failed.  There could be a number of reasons.  
He would stay out of areas of testimony about problems with the regulator.
        The 
fourth certified fire investigator who testified was Murray & Massie’s 
expert, Jean McDowell.  McDowell is a forensic engineer and a Fellow in the 
Academy of Forensic Science and serves on the LP Gas Advisory Commission to the 
Texas Railroad Commission, advising it on standards and safety regarding liquid 
propane gas.  He visited the site of the fire in 1995, and assisted in 
collecting, tagging, and storing evidence.  If a gas leak coupled with the 
stove as the source of the ignition caused the fire, as theorized by Appellants, 
in his opinion there would have been an explosion, but he found no evidence of 
an explosion at the site.  However, there was not enough evidence left from 
the fire to determine the origin and cause of the fire, in his opinion.  
There was not enough wire left to determine whether it was electrical, nor could 
he determine whether the fire might have started in the kitchen.  The fire 
itself had destroyed the evidence.  In McDowell’s opinion, the origin and 
cause of the fire should have been classified as “undetermined.”
        Appellants 
seem to argue that only certified fire investigators are qualified to express 
opinions on the cause and origin of fires.  But the closest that two of the 
certified fire investigators, Lemons and Duke, came to identifying the cause of 
the fire as being connected with the regulator was in expressing the opinion 
that it was some kind of gas leak originating in the area of the furnace in the 
laundry room.  The third certified fire investigator, Chaney, acknowledged 
he was not qualified to commit to a professional opinion regarding the control 
valve or regulator.  The fourth, McDowell, was of the opinion that the 
cause could not be determined from the evidence.  We are aware of no case 
law holding that only fire investigators certified by the State of Texas may 
testify regarding the cause and origin of a fire.  Moreover, Appellants do 
not claim that those experts’ testimony overwhelmingly established that the 
regulator was a cause-in-fact of the fire.
        Other 
experts specifically testified about the regulator and Murray & Massie’s 
role.  Robert Ross, Appellants’ standard of care expert, testified for 
Appellants that, in his opinion, the probable cause of the leak and fire was 
that the regulator malfunctioned because of a blocked vent exposed to freezing 
rain and insects and facing the wrong way, and because the regulator was old and 
the seat had become brittle, allowing gas to leak into the home.  However, 
Ross never tested the regulator.  Ross acknowledged that, when the 
regulator in question was tested three years after the fire, it never delivered 
enough pressure to cause any damage to the control valve or house.
        Murray 
& Massie presented two experts whose testimony directly controverted 
Appellants’ liability theory.  James Peterson, a licensed professional 
engineer, had worked for Fisher and other manufacturers in design and management 
and was familiar with regulators for propane tanks and regulator-related 
incidents.  Peterson analyzed the regulator in question for the defense and 
reviewed the depositions and reports of the other experts.  Peterson 
explained how the Fisher 922 regulator worked and described possible causes of 
failure, none of which occurred here, in his opinion.  Peterson testified 
as to tests he performed on the regulator:
  
Q. Mr. Peterson, I’m going to show you Exhibit 1.  Would you take a look 
at that and tell me what that exhibit depicts?
 
A. 
Oh, yes.  Those are what I would call my field notes when we were 
conducting the tests at Mr. Dunn’s office.
 
Q. 
And do they indicate what pressures you were able to obtain?
 
A. 
Yes.
 
* 
* *
 
Q. 
What’s the significance of the pressures you found?
 
A. 
Those pressures are slightly higher than what the factory would have set them 
at.  They’re not abnormally high.  They’re slightly high, but 
nothing that should cause any damage to any downstream components.

        Peterson 
further testified, based upon his examination of the regulator, that it was 
generally in good condition.  In his opinion, the regulator was not a cause 
of the fire.  Additionally, as we have noted, Jean McDowell testified the 
destruction of evidence at the scene was so great that it precluded any 
definitive conclusion as to the cause and origin of the fire.  And as 
Appellee points out, McDowell also provided testimony that disputed 
Appellants’ theory of a flash fire that created a “fireball” as described 
by Laura Blevins, which formed the basis for their theory that gas accumulated 
and ignited over the stove.  McDowell testified he was unable to replicate 
such an explosion when he properly vented the mock-up of the trailer for his 
tests.  He further testified:
  
A. [W]hen the mother woke up . . . [,] she said her light didn’t work.  
Also, when the door was opened, there was just black smoke.  Those two 
things are not indicative of a flash fire.
 
Q. 
Why is that?
 
A. 
Well, a flash fire is just that, a very short-term fire that does not have 
sufficient longevity to ignite solid combustibles. . . . But when you’ve got 
an electrical system damaged, this is a fire that has penetrated into the 
structural members of the frame. . . .  I don’t know if it ran through 
the wall or through the ceiling to get to the other end of the trailer.  
But I think the reason the light didn’t work, it’s more likely than not the 
fire had already interrupted the circuit.
 

        Appellants 
urge that this case is like Hickson v. Martinez, 707 S.W.2d 919 (Tex. 
App.— Dallas 1985), writ ref’d n.r.e., 716 S.W.2d 499 (Tex. 1986), in 
which the Dallas Court of Appeals held that a jury finding that the defendant 
doctor did not fail to properly diagnose, treat, or stabilize the patient was 
contrary to the overwhelming weight of the evidence.  Id. at 
924.  In Hickson, four medical experts testified that in their 
opinions the defendant doctor acted contrary to a reasonably prudent physician 
and the only defense expert testified that he did not think the defendant doctor 
acted improperly in transferring the patient to another hospital.  Id.  
Unlike the testimony of the defense expert in that case, the defense experts’ 
opinions here went to the heart of Appellants’ claim of negligence against 
Murray & Massie that depended upon the regulator being a cause of the 
fire.  Peterson’s testimony directly contradicted Appellants’ 
experts’ opinions that failure, malfunction, or age of the regulator was the 
cause of the fire, as well as their theory that the fire was a flash fire from 
ignition of gas that consumed the home in minutes.  Murray & Massie’s 
regulator experts countered their own experts’ opinions that a fifteen-year 
old regulator represented a hazard and needed to be replaced as well as whether 
the regulator was a cause of the fire.
        Like 
many medical malpractice suits, this case comes down to a “battle of the 
experts.”  See Cruz ex. rel. Cruz v. Paso Del Norte Health Found., 
44 S.W.3d 622, 646 (Tex. App.—El Paso 2001, pet. denied) (holding refusal to 
find nurse negligent not against overwhelming weight of evidence where opinions 
of experts for both parties conflicted); see also Magee v. Ulery, 993 
S.W.2d 332, 336 (Tex. App.—Houston [14th Dist.] 1999, no pet.) 
(holding failure to find physician negligent not against overwhelming weight 
where jury could have believed defense expert that diagnosis was erroneous but 
not negligent); Crawford v. Hope, 898 S.W.2d 937, 942-43 (Tex. 
App.—Amarillo 1995, writ denied) (noting “battle of experts” existed in 
suit against physician for prescribing ineffective medication; weight of 
evidence was for jury and failure to find proximate cause not manifestly unjust 
or clearly erroneous).  In a “battle of competing evidence,” it is the 
sole prerogative of the jury to determine the weight and credibility of the 
witnesses, the obligation of the respective advocates to persuade them, and 
“our obligation to see that the process was fair and carried out according to 
the rules.”  Cruz, 44 S.W.3d at 646.  We cannot substitute 
our judgment for that of the jury simply because we may disagree with the 
jury’s findings.  Jones, 32 S.W.3d at 743 (citing Herbert, 
754 S.W.2d at 142).  As fact finder, the jury is authorized to disbelieve 
expert witnesses.  See Waltrip v. Bilbon Corp., 38 S.W.3d 873, 882 
(Tex. App.—Beaumont 2001, pet. denied).  Here, the jury believed Murray 
& Massie’s experts that the regulator did not cause the fire, rather than 
the experts offered by Appellants.  We are unable to conclude that the 
jury’s refusal to find that any negligence of Murray & Massie was a 
proximate cause of the occurrence was against the overwhelming weight and 
preponderance of the evidence.
CONCLUSION
        The 
jury’s negative answer to jury question number one could have been based upon 
a refusal to find that any negligence of Murray & Massie was a proximate 
cause of the fire and the injuries and deaths for which Appellants sued.  
The additional finding that the percentage of causation attributable to Murray 
& Massie was “0” demonstrates that is exactly what the jury refused to 
find.  The negative answer is not so against the overwhelming weight and 
preponderance of the evidence as to be manifestly wrong and unjust and is 
sufficient to support the judgment.  Therefore, even if the evidence is 
legally or factually insufficient to support the finding that Blevins and 
Hutchison were contributorily negligent, any error is harmless, and we 
accordingly overrule Appellants’ first issue.  Likewise, any refusal to 
find that Murray & Massie was negligent, even if contrary to the 
overwhelming weight of the evidence, is harmless.  We thus overrule 
Appellants’ second issue.  And because the jury’s refusal to find 
proximate cause supports the take-nothing judgment, it is unnecessary to reach 
Appellants’ third issue complaining that the jury’s failure to award damages 
to Appellants is against the overwhelming weight and preponderance of evidence. Tex. R. App. P. 47.1.  We affirm 
the judgment of the trial court.
 
  
                                                                  ANNE 
GARDNER
                                                                  JUSTICE
   
PANEL 
B:   CAYCE, C.J. and GARDNER, J.
 
DELIVERED: 
January 6, 2005

NOTES
 
1.  Appellants and Intervenors Randy Edward Hutchison, as 
heir and personal representative of the Estates of Cody and Elizabeth, and 
Sharon Hutchison, as assignee, joined in this appeal and adopted in all respects 
the brief of the above-named Appellants.
2.  
Blevins first testified that she tried to call Murray & Massie but its 
office was closed for vacation.  However, she admitted that she had not 
paid Murray & Massey for its latest three deliveries and still owed it money 
when she called Calvin Gas.
3.  
A summary judgment in favor of Murray & Massie was reversed and the cause 
was remanded as to it in Hutchison, et al. v. Vincent Pharris d/b/a Murray 
& Massie Butane, No. 2-99-347-CV (Tex. App.—Fort Worth June 14, 2001, 
pet. denied).
4.  
The jury answered “no” to jury question number three as to whether failure, 
if any, of Murray & Massie to replace the regulator was a failure to perform 
services in a good and workmanlike manner and a producing cause of the 
occurrence in question.  Consequently, the jury did not reach question 
number four, inquiring whether such failure was committed knowingly.  
Appellants do not complain of the jury’s failure to find in their favor on 
these issues.
5.  
See Comm. On Pattern Jury Charges, State 
Bar of Tex., Texas Pattern Jury Charges—General Negligence & Intentional 
Personal Torts PJC 4.1, 4.3 (2003).
6.  
Appellants contend that the minimum standards for fire investigation personnel 
are established by the Texas Commission on Fire Protection.  See Tex. Gov’t Code Ann. § 419.025 
(Vernon 1998).  As promulgated by that Commission, the current minimum 
standards require an individual to be certified as a fire investigator by the 
State to determine the cause and origin of fires.  Texas Comm’n on Fire Protection, Standards Manual for Fire Protection Personnel 
§ 431.201(d), http://www.tcfp.state.tx.us/standards/standards_manual/print_ 
rule.asp?rule=431.201.
7.  
As Murray & Massie points out, the jury was asked whether Blevins or 
Hutchison’s negligence, if any, proximately caused the “occurrence,” not 
the “fire.”  Moreover, the jury sent out a question asking for a 
definition of “‘occurrence?’ as it relates to negligence? (in question # 
1) fire deaths or ____?”  The court instructed the jury: “ . . . you 
are advised that ‘occurrence’ in Question # 1 is the event, the deaths or 
the injury, if any.” (emphasis added).  Therefore, it is clear from 
the record that the jury did not find that any negligence of Blevins and 
Hutchison caused the fire.
8.  
Asserting the legal sufficiency complaint only in their motion for new trial 
entitles Appellants only to a remand, rather than rendition, if sustained.  
See In re W.E.C., 110 S.W.3d 231, 237 n.3 (Tex. App.—Fort Worth 2003, 
no pet.) (citing Horrocks v. Tex. Dep’t of Transp., 852 S.W.2d 498, 499 
(Tex. 1993)).
9.  
Appellants did not object to the charge, and do not complain on appeal, as to 
submission of jury question number one in broad form because one element or 
theory submitted lacked evidentiary support.  Therefore, we express no 
opinion as to whether this submission may have prevented proper presentation on 
appeal by improperly commingling theories, elements, or defenses lacking legal 
(or factual) evidentiary support.  See Crown Life Ins. Co. v. Casteel, 
22 S.W.3d 378, 390 (Tex. 2000) (reversing judgment based on answer to jury 
question improperly combining valid and invalid theories where timely and proper 
objection was made); see also Harris County v. Smith, 96 S.W.3d 230, 233 
(Tex. 2002) (holding error in submitting damage question combining some elements 
supported by legally insufficient evidence was reversible where proper objection 
was made to broad-form submission).
10.  
See also Schneider v. Schneider, No. 2-02-075-CV, 2004 WL 254247, at *2 
(Tex. App.—Fort Worth Feb. 12, 2004, pet. struck)(not designated for 
publication) (no-evidence complaint as to ground for divorce based on 
abandonment harmless where other unchallenged grounds supported judgment); Tollen 
v. Benson, No. 08-01-00006-CV, 2002 WL 244823, at *3 (Tex. App.—El Paso 
Feb. 21, 2002, pet. denied) (not designated for publication) (any error in 
submission of comparative negligence of plaintiff and finding of 100 percent 
responsibility harmless absent challenge to jury’s negative answer regarding 
defendant’s negligence or proximate cause).
11.  
Bankhead v. Maddox, 135 S.W.3d 162, 163-64 (Tex. App.—Tyler 2004, no 
pet.) (citing Anderson Producing Inc. v. Koch Oil Co., 929 S.W.2d 416, 
424 (Tex. 1996)); Barnes v. SWS Fin. Servs., Inc., 97 S.W.3d 759, 765 
(Tex. App.— Dallas 2003, no pet.); JHC Ventures, L.P. v. Fast Trucking, Inc., 
94 S.W.3d 762, 773, n.9 (Tex. App.—San Antonio 2002, no pet.); see also 
Penley v. Westbrook, No. 2-02-260-CV, 2004 WL 1119361, at *4 (Tex. 
App.—Fort Worth May 20, 2004, pet. filed); Tex. R. App. P. 38.1, 38.3.
12.  
See Carone v. Retamco Operating, Inc., 138 S.W.3d 1, 7-8 (Tex. App.—San 
Antonio 2004, pet. denied) (considering issue as properly presented where fully 
briefed and responded to by both parties, citing McKelvy v. Barber, 381 
S.W.2d 59, 62 (Tex. 1964)).
13.  
Robert Ross, Appellants’ own standard of care expert, noted that neither Duke 
nor Lemons reported that the leak originated in the furnace control valve.